**SMITH & WELTON, Incorporated, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 2374.**

United States District Court
E. D. Virginia,
Norfolk Division.

Aug. 8, 1958.

Charles L. Kaufman, T. Howard Spainhour, Norfolk, Va., for plaintiff.

L. S. Parsons, Jr., U. S. Atty., Norfolk, Va., for defendant.

WALTER E. HOFFMAN, District Judge.

The issue in this case is whether a department store's loss on the sale of common stock of one of its suppliers is a deductible business expense or a capital loss under the circumstances presented.

Plaintiff has for many years operated a substantial retail department store in the main business district of Norfolk, Virginia. Since 1951 it has also operated a branch at Virginia Beach, and, shortly thereafter, opened a branch in the Ward's Corner area of Norfolk—a section of the city which has become increasingly popular with suburban shoppers. For a long period of time prior to 1950, Handmacher-Vogel, Incorporated (referred to as Handmacher), manufactured a quality line of ladies' suits, and plaintiff's store was the only retail outlet for this line within the area comprising plaintiff's normal sales territory. Plaintiff had, through extensive advertising, created a public demand for Handmacher garments and the line had proved to be very profitable. In 1950, plaintiff had no comparable line of quality merchandise viewed from the standpoint of public demand.

During the latter part of 1949 or early 1950, Handmacher, seeking to expand its operations, advised plaintiff that it wanted plaintiff to purchase at least 500 shares of Handmacher stock at $10 per share. Handmacher went even further and stated that, unless plaintiff purchased at least $5,000 worth of capital stock, it would no longer sell to plaintiff but would permit its line to be handled by a competitor. Plaintiff, having reviewed the Handmacher prospectus, was not desirous of purchasing the stock and, while exercising delaying tactics, learned that a department store in Tennessee had refused to purchase stock, whereupon Handmacher declined to make further sales and permitted its line to be marketed by a competing store located on the opposite side of the street. Finally,

Handmacher telegraphed plaintiff requesting the $5,000 and suggesting that the receipt of same was necessary before processing plaintiff's orders then on hand. Thereafter, on June 26, 1950, plaintiff forwarded its check and purchased 500 shares of Handmacher stock at $10 per share. On or about October 29, 1953, plaintiff sold the entire 500 shares to one Leonard Rubin for $2 per share. When plaintiff filed its corporate income tax return for the year ending January 31, 1954, a loss of $4,000 was shown thereon as a business expense growing out of the sale of the Handmacher stock.

In demanding the purchase of its stock, Handmacher did not suggest under what terms plaintiff would be required to hold the same. Certainly there was no legal prohibition against an immediate resale, but plaintiff labored under the impression that it was essential for plaintiff to be classified as a stockholder in order to enjoy the exclusive line in the Norfolk area. The fact that Handmacher used such tactics in requiring its customers to buy blocks of stock is abundant evidence that the expansion program was not generally accepted as a "blue-chip" investment. It is not unreasonable to assume that if Handmacher had discovered that plaintiff had resold the stock (probably to a Handmacher customer), Handmacher would again turn to plaintiff and demand a further purchase. For this reason plaintiff endeavored to make immediate arrangements to obtain a comparable line from other sources. While these efforts were successful, it was also necessary to create customer demand for the new line through the medium of an extended period of advertising. It was not until the latter part of 1952 that plaintiff first considered selling the stock, at which time plaintiff was then willing to accept the risk of losing the Handmacher line as the new and comparable line had been sufficiently developed. After several months of searching for a buyer of the entire block of stock, plaintiff located a purchaser in the fall of 1953 and consummated the transaction.

There are certain factors which must be considered in determining the intent of the taxpayer. Defendant points out that a partial inducement for the stock purchase was Handmacher's promise to accept the return of, and give credit for, a line of "golfers" to the extent of approximately $4,000 which plaintiff had on hand. The evidence reveals, however, that this separate transaction was negotiated through a representative of Handmacher who had nothing to do with the sale of the stock. True, this fact may have been one of the principal arguments between plaintiff's corporate officers which persuaded plaintiff's president ultimately to give his consent to the purchase of the stock, but it was not a part and parcel of the stock purchase agreement and, in the opinion of at least one corporate officer, the stock purchase would have been necessary in any event to maintain the Handmacher line. We are next told that plaintiff received and reported dividends at the rate of $300 per year up to January 31, 1952, but only received $75 in dividends for the year ending January 31, 1953, and thereafter sold the stock in October, 1953, without receiving further dividends. In the meantime, the stock was declining in value and Handmacher's sales and profits were appreciably diminished. Finally, it is suggested that plaintiff did not inquire from stores in Portsmouth or Newport News, where Handmacher lines were being handled, as to whether these stores had been required to make similar stock purchases. These factors have been weighed and considered by the Court in determining the intent at the time of purchase, the intent during the period of retention of the stock, and the intent at the time of sale—all of which are important in arriving at a final conclusion—but despite these arguments, it is the opinion of the Court that at no time was the Handmacher stock acquired, held or sold as an "investment" asset as construed by the pertinent authorities.

The Handmacher stock was recorded as an "investment account" on taxpayer's books and federal income tax returns. Such a fact is competent evidence tending to show that the asset was an investment rather than a business expense. Exposition Souvenir Corp. v. Commissioner, 2 Cir., 163 F.2d 283; Martin v. United States, 56–2 U.S.T.C. par. 9990; Planters Exchange, Inc. v. United States, 57–1 U.S.T.C. par. 9565. But the manner in which such an asset is carried upon the books and tax returns is by no means conclusive. Tulane Hardwood Lumber Co., Inc., v. Commissioner, 24 T.C. 1146. There is no showing in this case that the corporate officers understood the accounting problems relating to the treatment of this stock. The books were kept, and the tax returns were prepared, by an independent firm of certified public accountants. Indeed, even if the accountants had been fully aware of the underlying reasons for the stock purchase, it is at least a debatable point that general accounting principles would have called for the recordation and reporting of the stock in the manner adopted.

Defendant argues that if the stock purchase in question does not come within one of the specified exceptions of § 117(a) (1) of the Internal Revenue Code of 1939, as amended by § 210(a) of the Revenue Act of 1950, 26 U.S.C.A. § 117 (a) (1), it must be treated as a capital asset and the loss from its sale must be treated as a capital loss. The short answer to this contention is that the authorities do not support this view. In Commissioner of Internal Revenue v. Bagley & Sewall Co., 2 Cir., 221 F.2d 944, 946, it is said:

"In brief, it is urged that the all inclusive language of Section 117 requires that, since the bonds are 'property', they must be treated as capital assets unless exempted by the specific language of the Section. The argument carries with it the necessary conclusion that the circumstances of the transaction, its factual background, the necessities of the business involved and the intentions of taxpayer are of no importance except in determining whether the bonds are exempted under the Section. We are not persuaded that Section 23 is so completely subordinate to Section 117 and we find no authority which goes so far."

Likewise, in Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 76 S. Ct. 20, 24, 100 L.Ed. 29, the intent of Congress is stated to be that profits and losses arising from the everyday operation of a business should be considered as ordinary income or loss rather than capital gain or loss and, in referring to § 117, it is noted:

"The preferential treatment provided by § 117 applies to transactions and property which are not the normal source of business income."

It is manifestly clear from the foregoing that the stock purchase transaction cannot be divorced from the circumstances surrounding the acquisition of said stock. The contract may not be thus atomized. Helvering v. New Haven & S. L. R. Co., 2 Cir., 121 F.2d 985.

We have no difficulty in concluding that plaintiff did not acquire the Handmacher stock as an investment. The only other securities owned by taxpayer were stock in the Portsmouth Hotel Corporation and Cavalier Hotel Corporation, admittedly acquired for purposes of community good will, and stock in Charga-Plate, a corporation operating a credit system in use by many area stores. The latter may well be an ordinary and necessary business expense under the rule in Commissioner of Internal Revenue v. The Hub, 4 Cir., 68 F.2d 349. Undoubtedly it is a difficult matter to determine whether an expenditure is "ordinary and necessary", as is suggested by Justice Cardozo in Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212, as follows:

"One struggles in vain for any verbal formula that will supply a

ready touchstone. The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle."

In the great majority of cases the trend reveals that much weight should be given to the intent of the taxpayer as evidenced by all the facts and circumstances of the case. We recognize that the purpose for which the stock was acquired may change, as in Gulftex Drug Co. v. Commissioner, 29 T.C. 118 (pending on appeal to the Fifth Circuit), where there was no continuing purpose in holding the stock for nine years after the purpose for which it was acquired had been served. For this reason we must consider taxpayer's intent during the period of retention and at the time of sale for tax purposes. The approach is factual and each case involves an appreciation of particular situations, at times with borderline conclusions. Welch v. Helvering, 290 U.S. 111, 116, 54 S.Ct. 8, 78 L.Ed. 212.

The Court believes that a distinction has been drawn between cases in which securities are acquired for the purpose of obtaining an advantage which did not previously exist, as contrasted with situations in which securities are purchased for the purpose of protecting that which existed and is now threatened. Defendant relies heavily upon Exposition Souvenir Corp. v. Commissioner, supra, in which the taxpayer purchased a large amount of debentures of the New York World's Fair as a condition precedent to obtaining the souvenir concession on the fair grounds. Two years later the debentures were in default, the Fair was closed, and taxpayer claimed a loss as ordinary and necessary expense at the time of sale. The Tax Court held that this was a capital loss. At the outset it should be noted that Exposition Souvenir was decided by the Second Circuit, on appeal from the Tax Court, in 1947. The effect of this decision is substantially weakened in view of the fact that the case was decided under the rule of Dobson v. Commis-

sioner, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248, which obligated the Circuit Court of Appeals to follow "findings of evidentiary facts". The Dobson rule was rescinded by statute in 1948 and now appears in § 7482 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 7482. Since 1948 determinations by the Tax Court are reviewable "in the same manner and to the same extent as decisions of the District Courts in civil actions tried without a jury". Noting the language of the Second Circuit in Exposition Souvenir, it is to some extent problematical as to whether the same result would be reached in the present day. It is unnecessary, however, to confine any discussion of distinctions in Exposition Souvenir to the change in the Dobson rule. In Commissioner of Internal Revenue v. Bagley & Sewall Co., supra, the court, in referring to Exposition Souvenir pointed out that the purchase of the debentures was merely "related to, but not a part of the concession contract". In Canton Cotton Mills v. United States, 94 F.Supp. 561, 564, 119 Ct.Cl. 24, money voluntarily refunded to taxpayer's customers was held to be properly deductible as an ordinary and necessary business expense incurred "to protect and nurture existing good will", as contrasted with Welch v. Helvering, supra, in which the voluntary payment was made to "acquire" good will. Adopting the same approach, Exposition Souvenir falls into place with Welch v. Helvering as the expenditure for the debentures was made to acquire new business. Thus it appears that courts have been more inclined to classify as ordinary and necessary business expense such items as are in the nature of a protection of an existing business asset.

The rationale of the many cases involving purchases of stock in corporations distilling whiskey during the days of liquor shortages is to the same effect, i. e., that there was an expenditure "to protect existing business", but these authorities are not deemed to be particularly applicable as rights to purchase whiskey were generally made an express part

of the stock purchase. Western Wine & Liquor Co. v. Commissioner, 18 T.C. 1090; Charles A. Clark, 19 T.C. 48; Hogg v. Allen, D.C., 105 F.Supp. 12, affirmed sub nom. Edwards v. Hogg, 5 Cir., 214 F.2d 640; Flom v. Hofferbert, 56–1 U.S.T.C. par. 9236. These cases are appropriate in determining the intent of the taxpayer and have been cited with approval in other than the so-called "whiskey purchase" cases.

In summary, after considering the total securities held by taxpayer, the fact that the acquisition of the Handmacher stock was unattractive as an investment but necessary to insure a source of supply, the intention of the taxpayer not to hold the stock longer than reasonably necessary under the practical considerations involved, the taxpayer's lack of intention to hold the stock as an investment despite its treatment on the books, the relation of the loss to that of the acquisition, and the intent and motive of the taxpayer during the period of retention of the stock, we come perforce to the conclusion that the loss was an ordinary and necessary business expense deductible in full under § 23 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23.

Finally, the Court is asked that the loss be limited to $3,500, rather than $4,000, for the reason that if the stock had been listed with a stockbroker, the taxpayer would have realized $3 per share. Assuming the facts to be as contended by defendant, the Court does not believe that the point merits discussion. The rule requiring a plaintiff to minimize his loss or damage has not, to the knowledge of this Court, been applied in tax refund cases of this character. The law does not condition the deduction for a loss incurred on the sale of property upon any requirement that the sale price be the highest price that might be obtained, absent, of course, fraud or collusion. There was certainly no profit to plaintiff in selling at $2 per share when $3 may have been obtained—the tax differential is not advantageous to plaintiff. If the taxpayer has in good faith committed an error in judgment in selling at the price stated, the loss is nonetheless deductible.

Counsel for plaintiff will prepare a judgment order in accordance with this opinion, which is adopted by the Court in lieu of specific findings of fact and conclusions of law, and, after presentation to counsel for defendant for inspection and endorsement, the same shall be transmitted to the Court for entry as a final judgment.