**JOURNAL COMPANY, a corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 60–C–32.**

United States District Court
E. D. Wisconsin.
July 11, 1961.

Richard B. Barker and Joseph E. McAndrews, Washington, D. C., and Edmund B. Shea and Paul F. Meissner, Milwaukee, Wis., for plaintiff.

Bruno Lederer, Dept. of Justice Tax Division, Trial Section, Washington, D. C., and James B. Brennan, U. S. Atty., Milwaukee, Wis., for defendant.

GRUBB, District Judge.

This is an action to recover federal income and excess profits taxes for the calendar year 1950 in the amount of $207,925.48, together with interest and costs. By way of motion to amend its answer, the government seeks to raise the defense of equitable recoupment in the event that plaintiff recovers in this suit.

The following facts have been established by stipulation of the parties and by the evidence: Plaintiff, The Journal Company (hereinafter called "Journal"), is a Wisconsin corporation engaged in the publishing of a newspaper known as "The Milwaukee Journal." During the years 1946 through 1950, there was an acute shortage of newsprint at O.P.A. ceiling prices, which shortage affected the Journal's business operations, particularly with respect to the curtailment of advertising volume and circulation. After investigating various additional sources of newsprint, the Journal purchased from individual stockholders 200 out of 500 outstanding shares of capital stock of Peavey Paper Mills, Inc. (hereinafter called "Peavey") at a total price of $600,000 on September 26, 1946. At this time, the stock in question had a book value of approximately $800 a share, or $160,000 for 200 shares.

At the same time the Journal and Peavey entered into a contract whereby Peavey agreed to sell and deliver newsprint to the Journal. This contract covered the period from December 1, 1946 to November 30, 1948, but was renewable for one year thereafter. It called for

twelve thousand tons of newsprint during the two years in question and an additional six thousand tons if renewed for the additional year. It was renewed, but on May 20, 1949, was cancelled by mutual consent. This additional newsprint which the Journal could not otherwise have obtained at O.P.A. prices resulted in an increased circulation of the daily paper from 300,084 in 1946 to 326,298 in 1950 and of the Sunday paper from 352,930 to 438,952. The increase in revenue from circulation was from $3,356,545.51 to $5,420,843.26. The Journal was thereby enabled to increase the advertising linage from 24,455,472 in 1946 to 43,968,984 in 1950, and the advertising revenue from $6,217,190.61 in 1946 to $13,492,188.44 in 1950.

During the year 1949, negotiations were commenced respecting the disposition of the paper mill stock. Correspondence between the attorneys for the parties reveals that some of the former stockholders expected the return of the stock, possibly gratis, at the conclusion of the newsprint contract. These negotiations culminated in the resale and delivery of the stock to Peavey Paper Mills, Inc., on November 24, 1950, for $200,000 cash. On November 29, 1950, the parties entered into another contract for the sale and delivery of newsprint, of which there was still a shortage, for the period of December 1, 1950 to November 30, 1951, at a price of $170 per ton.

In filing its tax return for the year 1950, the Journal treated the $400,000 difference between the purchase price of the stock and the value obtained on resale thereof as a capital loss.

In 1954, following the decision in Western Wine and Liquor Co. v. Commissioner, 1952, 18 T.C. 1090, acq. 1958–1 Cum.Bull. 6, the Journal filed a claim for refund of overpayments of income and excess profits taxes for the year 1950, which overpayments would have resulted from giving effect to the loss sustained on sale of the paper mill shares as an ordinary business expense or cor-

porate loss rather than as a capital loss. The claim for refund was rejected by the Commissioner, and the Journal commenced this action in due time, pursuant to waivers filed by the parties, which kept the Statute of Limitations open on the time to file suit.

On the trial it was established by uncontradicted evidence that the newsprint received from the paper mill aided in alleviating the Journal's newsprint shortage problem. It made the expansion in circulation, advertising linage, and vast increases in revenue above mentioned possible. The business manager of the Journal served on the Board of Directors of Peavey during the period of the Journal's ownership of paper mill stock. He testified that he assumed this position for the purpose of insuring the satisfactory performance of the newsprint contract and, further, that the Journal aided the paper mill in securing necessary supplies and advice in its newsprint operations.

It was further shown that the Journal received dividends on the paper mill stock in a total amount of $19,435 for the years 1946, 1947, and 1948. The purchase and sale of the paper mill stock were reflected on the Journal's records under an account labelled "Investments-Special." Other transactions there recorded were concerned with collateral business enterprises engaged in by the Journal as, for example, real estate subsidiary corporations, radio operations, sales organizations as to advertising features, and an employees' trust organization.

The Journal now contends that the purchase and sale of the paper mill stock was an integral part of its business operations. It claims that any loss arising from this transaction must be treated as an ordinary business expense or corporate loss, to be deducted from gross income in the calendar year in which the loss was sustained under §§ 23(a) or 23(f) of the Internal Revenue Code of 1939, Title 26 U.S.C.A., and Regulation 118, § 39.23(a)–1, applicable thereto.[1]

1. "§ 23. *Deductions from gross income.* In computing net income there shall be allowed as deductions:
"(a) *Expenses.*

It was conceded by both parties that the issue here involved is one of intent. In the light of the testimony of the business manager of the Journal that the Journal's sole purpose in the transaction was to procure newsprint which it could not otherwise have obtained at O.P.A. prices, as to which testimony the government offered no contradictory evidence, did the Journal intend to make an investment in Peavey stock, or did it intend to use the stock purchase as a device to circumvent O.P.A. regulations and to get newsprint at O.P.A. prices?

▮ The government proposes alternative theories as to the proper tax treatment of the consequences of the Journal's paper mill stock transaction. On the one hand, the government claims that the Journal purchased the stock with the intent of making an investment in a paper mill, or in the event it did not entertain an investment motive on acquisition of the stock, it nevertheless elected to hold the shares as an investment. A loss arising from the sale of stock acquired or held as an investment must be treated as a capital loss in the manner in which the Journal reflected the transaction in the return filed for the year 1950.

Alternatively, and conceding a business rather than investment motive in the transaction, the government submits that the purchase price of the stock was in fact a disguised advance payment for newsprint, so concealed in order to circumvent the governmental price control of newsprint under O.P.A. regulations. It is claimed that an advance payment must be treated as part of the cost of inventory acquired under the newsprint contract, to be prorated over the period during which the newsprint was consumed in the Journal's operations.

As another aspect of the alternative theory which concedes the Journal's business rather than investment purpose in the transaction, the government proposed that a portion of the purchase price of the paper mill stock was in fact a payment to the controlling stockholders of the paper mill to induce them to cause the corporation to enter into a newsprint contract. Such a payment, it is claimed, would constitute a capital expenditure to be amortized over the life of the contract.

The record shows that business exigencies created by operational demands and by the shortage of newsprint in the face of government price regulation of this commodity induced the Journal to acquire a substantial stock interest from the controlling stockholders of a potential supplier of newsprint. The Journal's purpose in the transaction was the securing of a supply of inventory essential to its business operations, which supply could not otherwise be obtained at established O.P.A. prices.

Testimony relied on by the government as indicating an investment intent in this transaction is not persuasive. Impressions of a stockholder-officer of the paper mill that the Journal was interested in long term ownership of the mill are modified by further opinions that there was a dual purpose in the transaction and by the expectation that the stock would be returned on the termination of the contract.

Recording of the stock transaction under an account designated "Investments-Special" may be one factor to be considered in determining intent, but is not conclusive on the question. Smith & Welton, Inc. v. United States, D.C.E.D. Va.1958, 164 F.Supp. 605. Furthermore,

"(1) *Trade or business expenses.*
"(A) *In general.* All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *.
 * * * * *
"(f) *Losses by corporations.* In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise."
"§ 39.23(a)–1 *Business expenses*
"Business expenses deductible from gross income include the ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business, * * *."

the nature of other transactions recorded in this account indicate that these are not concerned with investments but with the Journal's collateral business enterprises, notwithstanding the title of the account.

The Journal's participation in the affairs of the paper mill is adequately accounted for by its concern for its source of newsprint. Lack of investment motive in the stock acquisition and holding does not require indifference or neglect as to the asset acquired or the purpose to be accomplished thereby.

Receipt of dividends in a total amount of $19,435 over the total period of the Journal's stock ownership as a return on an outlay of $600,000 has little or no bearing on the purpose for which the stock was purchased. It appears to offer little inducement for the retention of the stock with investment intent beyond the period of its usefulness in securing newsprint, particularly where no dividends were paid for the years 1949 and 1950.

The record further shows that the Journal initiated negotiations for the disposition of the stock when it appeared that the purpose of its acquisition had been served in the year the newsprint contract was terminated and when the Journal believed it had an adequate source of supply of newsprint. The record does not support a finding that the Journal elected to hold the stock as an investment.

 The federal tax returns of the Journal for the year 1950, wherein the loss in question is treated as a capital loss, is competent evidence on the question of the Journal's intent in undertaking the stock transaction. The 1950 tax return does not accurately reflect the nature and actualities of the transaction which must be considered in light of the circumstances in which it was undertaken as shown by the evidence offered by the Journal. Practical considerations under the law controlling in 1950 may account for the Journal's purpose in choosing to characterize the paper mill stock

transaction as an investment enterprise for tax purposes. This choice is not conclusive on the question of intent where the record clearly indicates that the Journal bought, retained, and sold the stock in order to secure a source of newsprint. A loss arising from a transaction which is directly related to a taxpayer's business operations can be given effect as an ordinary loss by the taxpayer. Western Wine and Liquor Co. v. Commissioner, 1952, 18 T.C. 1090, acq. 1958–1 Cum. Bull. 6; Charles A. Clark v. Commissioner, 1952, 19 T.C. 48, acq. 1958–1 Cum. Bull. 4; Smith & Welton, Inc. v. United States, D.C.E.D.Va.1958, 164 F.Supp. 605; Electrical Fittings Corp. v. Commissioner, 1960, 33 T.C. 1026; and Bagley and Sewall Co. v. Commissioner, 1953, 20 T.C. 983, affirmed sub nom. Commissioner v. Bagley and Sewall Co., 2 Cir., 1955, 221 F.2d 944. Capital asset treatment is restricted to transactions in property which are not directly related to the normal source of business income. Corn Products Refining Co. v. Commissioner, 1955, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29, and see Revenue Ruling 58–40, 1958–1 Cum.Bull. 275.

The government's alternative theories allegedly barring recovery in this action are not applicable under the facts of this case. Giving effect for tax purposes to the difference between the purchase and sale price of the paper mill stock as part of the cost of inventory acquired thereby or as a payment to induce the stockholders to execute the newsprint contract requires that a portion of the value paid for the stock be identified with certainty as an amount in excess of the fair market value of the shares at the time of the purchase. While an approximate book value has been established, there is no evidence as to the fair market value of the stock at any time. There is some testimony as to the value to be paid on the return of the stock, but the actual repurchase price was determined after negotiation and bargaining and with expectation of the execution of a subsequent newsprint contract.

It may not be assumed that the amount of the loss of $400,000 sustained in 1950 could have been predicted or ascertained in the year 1946 when the transaction had its inception. Not only was the amount to be prorated as inventory cost or amortized as a capital expenditure unknown, but the amount of inventory to be acquired and the life of the contract similarly were undetermined in 1946. Under these circumstances the tax consequences of the total transaction could not be given effect prior to the year 1950 when the difference between the purchase and sales price of the paper mill stock became known and certain. Notwithstanding the various possible interpretations as to the nature of the $400,000 amount in question here, allowance of this amount as an ordinary loss in the year of the resale of the stock avoids violation of accepted tax and accounting principles. See United States v. S. S. White Dental Mfg. Co., 1927, 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120. Similar tax treatment of analogous transactions has received the approval of the courts. See Tulane Hardwood Lumber Co., Inc. v. Commissioner, 1955, 24 T.C. 1146, acq. 1958–2 Cum.Bull. 8; and Smith & Welton, Inc. v. United States, D.C.E.D.Va.1958, 164 F.Supp. 605.

■ The defense of equitable recoupment is not available to the government under the circumstances of this case. The government thereby seeks to reduce the Journal's recovery by alleged tax deficiencies for the years 1951, 1952, and 1953. These deficiencies result from reduction of the Journal's excess profits tax credits for the years in question due to the reduction of income for the year 1950 by allowance of an ordinary rather than a capital loss for that year which was relied on in the computation of a base period for determination of excess profits tax credits in subsequent years.

This defense was raised by the government after pretrial of the case and after a stipulation of facts had been submitted. The Journal disputes the proposed computation as to the amounts of deficiencies. The years 1952 and 1953 are open to the government. The year 1951 is closed under the Statute of Limitations. The Journal refused to waive the Statute of Limitations' defense as to 1951 and refused to permit readjustment on the basis of the amount that it would actually have owed if it is allowed to treat this $400,000 as an ordinary 'business loss.

In respect to tax deficiencies for the open years of 1952 and 1953, the government need not rely on the doctrine of equitable recoupment but may avail itself of administrative and legal remedies to determine the Journal's liability for those years.

■ Congress has established a statutory scheme for giving effect to the bar of the Statute of Limitations and in mitigation thereof under appropriate circumstances. See § 3770(a) (2), § 3775(a),[2] and § 3801 generally entitled "Mitigation of effect of limitation and other provisions in income tax cases," which sections were in effect at all times pertinent to this action. The court may not ignore or bypass these provisions by an award of equitable relief in respect to the closed year, 1951. In American Light & Traction Co. v. Harrison, 7 Cir., 1944, 142 F.2d 639, 154 A.L.R. 1042, taxpayer, as did the Journal in the instant case, took a later inconsistent position as to

2. "§ 3770. *Authority to make abatements, credits, and refunds*
"(a) *To taxpayers*
\* \* \* \* \*
"(2) *Assessments and collections after limitation period.* Any tax (or any interest, penalty, additional amount, or addition to such tax) assessed or paid after the expiration of the period of limitation properly applicable thereto shall be considered an overpayment and shall be credited or refunded to the taxpayer if claim therefor is filed within the period of limitation for filing such claim."
"§ 3775. *Credits after periods of limitation*
"(a) *Period against United States.* Any credit against a liability in respect of any taxable year shall be void if any payment in respect of such liability would be considered an overpayment under section 3770(a) (2)."

the tax consequences of a particular transaction. This resulted in an overpayment for an open year and an underpayment of taxes for a year closed to the government. The court held that equitable principles would defeat the claim for refund of overpayment of taxes, but that former §§ 607 and 609 of the Revenue Act of 1928—of which §§ 3770(a)(2) and 3775(a) are substantial restatements—barred the government's defense on the authority of McEachern v. Rose, 1937, 302 U.S. 56, 58 S.Ct. 84, 82 L.Ed. 46.

Additional facts militate against the award of recoupment in this action. The year 1951 was open to the government for about one year after the Journal gave notice of its inconsistent position. The government asserted this defense by motion to amend its answer shortly before the case was scheduled for trial and after the issues had been defined and narrowed on pretrial conference. Further, the amount of the alleged deficiency is disputed and may require the taking of additional evidence for its determination. These circumstances do not justify the granting of equitable relief.

The court hereby adopts the stipulation of facts as its findings of fact. In addition, the court makes the following findings:

1. The Journal undertook the purchase, retention, and sale of the stock of Peavey for the purpose of obtaining inventory at O.P.A. prices.

2. The loss sustained on sale of the paper mill stock was directly related to the Journal's business operations.

3. The amount of loss sustained by the Journal on sale of the paper mill stock became known and certain at the time the sale was consummated in the year 1950.

The court's conclusions of law are as follows:

1. The court has jurisdiction of this action pursuant to § 1346, Title 28 U.S.C.

2. The loss of $400,000 sustained by the Journal in the year 1950 on sale of Peavey stock constituted an ordinary deduction in computing taxpayer's income for the year 1950.

3. The defense of equitable recoupment is not available in this action.

4. The Journal is entitled to judgment in the amount of $207,925.48 with interest and costs according to law.

Counsel for the Journal is hereby directed to prepare an order for judgment and judgment in accordance with this opinion, submitting them to counsel for the government for approval as to arithmetical computation and form only.