MISSISQUOI CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 83059.   Filed January 17, 1962.

*John N. O'Donohue, Esq.*, for the petitioner.
*Raymond T. Mahon, Esq.*, for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency in petitioner's income tax for the taxable year 1955 in the amount of $16,521.54. There are two issues for decision: (1) Whether the loss incurred by petitioner in 1955 on the sale of debentures held by it is an ordinary business loss or a long-term capital loss, and (2) whether respondent erred in disallowing as a deduction for 1955 that part of the Vermont corporation franchise tax accrued by petitioner for 1955 but not paid until 1958.

FINDINGS OF FACT.

Some of the facts are stipulated and they are hereby found as stipulated.

Petitioner (Missisquoi) is a corporation organized under the laws of Vermont with its principal place of business in Sheldon, Vermont. Its corporate income tax return for 1955 was filed with the district director of internal revenue for the district of Vermont. In 1950 and all subsequent years pertinent to this case Missisquoi's principal business was the manufacture of paperboard.

In the years 1949 and 1950 Missisquoi obtained 80 percent of its supply of unbleached sulphite pulp, which was essential in its manufacture of paperboard, from St. Raymond Paper Limited, a Canadian corporation, hereafter referred to as Paper. Unbleached sulphite pulp was scarce in 1950 and a continuing and certain source of this pulp was of paramount importance to Missisquoi. In 1950 Missisquoi learned that a syndicate had acquired an option to buy the entire capital stock of Paper, and it became apprehensive that Paper would fall into the hands of others who had requirements for unbleached sulphite pulp and that such an occurrence would endanger its principal source of supply of the already scarce pulp. In order to protect itself, Missisquoi sought and purchased $250,000 (Canadian) face

value 3-percent sinking fund debentures of St. Raymond Properties Limited, hereafter referred to as Properties, a Canadian holding corporation which acquired the entire outstanding capital stock of Paper. These debentures were issued under and secured by an instrument entitled "Trust Deed of Hypothec, Mortgage and Pledge," executed by Properties to Montreal Trust Company, as trustee. Missisquoi paid $240,625 in United States currency for the debentures, and the purchase was made at the same time and was conditional on the execution of a contract whereby Properties agreed to supply and Missisquoi agreed to buy 2,500 tons of unbleached sulphite pulp per year for 10 years beginning January 1, 1951. Performance of the pulp contract was guaranteed in writing by Paper. The contract was assigned to Paper in 1952. The debenture purchase was not mentioned in the contract and the written contractual obligations of the parties were in no way contingent on Missisquoi's retention of the debentures.

The report of Missisquoi's president to its stockholders at a meeting of Missisquoi's stockholders held on April 11, 1951, provided in part as follows:

The investment of $240,625.00 in 3% sinking fund debentures of St. Raymond Properties, Ltd. was made in connection with a long-term contract for the purchase of sulphite pulp, and will aid in assuring a flow of raw material. Furthermore, the management considers the debentures to be securities of good quality.

This same language appeared in petitioner's annual report for the year 1950.

The total authorized amount of 3-percent sinking fund debentures of Properties was $5 million (Canadian). The total amount of these debentures "issued and fully paid" on December 31, 1950, was $3,190,000 (Canadian).

The total capital stock of Properties issued for cash consisted of:

| Number of shares | | Amount (Canadian) |
|---|---|---|
| 3,015 | preferred | $301,500 |
| 3,850 | common | 38,500 |
| | Total | 340,000 |

During the latter part of 1952 or early in 1953, Missisquoi surrendered the debentures of Properties and received in exchange $250,000 (Canadian) face value of 3-percent sinking fund debentures of Paper in connection with a reorganization involving the two Canadian corporations. The total amount of debentures of Paper "issued or to be issued" on December 31, 1952, and the total amount "issued" on December 31, 1953, was $3,190,000 (Canadian).

Under section 44 of the trust deed dated November 10, 1950, 90 per-

cent of the debentureholders of Properties were given the power to sanction any changes in the provisions of the debentures and any scheme for the reorganization, consolidation, or merger of Properties with any other company, including its subsidiary, Paper. Under section 43 of the trust deed the debentureholders of Properties were empowered to bring suit to obtain the security for the debentures in the event the security became enforcible within the meaning of section 27. Under section 27 the security became enforcible upon the happening of any of the events of default specified in sections 24(b) to (e), inclusive. Under section 24(c) a resolution passed for the winding up or liquidation of Properties is considered to be an event of default.

Beginning in 1951 and continuing through 1955, Missisquoi's need for unbleached sulphite pulp declined steadily because the paperboard market called for a paperboard of whiter consistency which required the use of bleached sulphite pulp. In addition to this, in 1953 it became considerably easier to acquire unbleached sulphite pulp on the spot market from suppliers other than Paper. These market conditions continued through the year 1955.

During the calendar years 1946 to 1955, inclusive, Missisquoi purchased unbleached sulphite pulp from all sources, including Paper, and from Paper in the following amounts:

| Year | Pounds purchased, all sources (including Paper) | Pounds purchased, Paper | Year | Pounds purchased, all sources (including Paper) | Pounds purchased, Paper |
|---|---|---|---|---|---|
| 1946 | 10,098,757 | 5,548,350 | 1951 | 7,766,175 | 4,940,955 |
| 1947 | 11,954,227 | 6,769,352 | 1952 | 4,718,947 | 3,266,078 |
| 1948 | 5,875,195 | 5,388,165 | 1953 | 5,518,958 | 3,415,541 |
| 1949 | 8,417,476 | 6,730,349 | 1954 | 4,222,810 | 2,914,490 |
| 1950 | 9,319,152 | 7,499,166 | 1955 | 3,985,023 | 2,122,125 |

Beginning sometime in 1952, Missisquoi, through its president, made frequent efforts to sell the debentures of Properties and then those of Paper and these efforts continued until the final sale in 1955. Missisquoi's president attempted to sell the debentures back to Properties, and subsequently to Paper, and asked one of Missisquoi's directors who was a stockholder and director in the Properties venture to intercede in his behalf. In addition, the president solicited brokerage houses in Canada, seeking a buyer, but his efforts were of no avail. The president, in his efforts to sell the debentures, did not at any time approach other corporations and businesses having requirements for unbleached sulphite pulp, nor did he inquire of others holding Properties and Paper debentures whether they had disposed of any of their debentures or whether they knew of any potential purchasers.

The interest on both debenture issues was 3 percent and during the

taxable years 1951 to 1955, inclusive, Missisquoi received interest payments on the debentures as follows:

| Year | Interest in United States funds | Exchange rate differential | Interest in Canadian funds |
|------|-------------------------------|---------------------------|---------------------------|
| 1951 | $7,154.09 | $345.91 | $7,500.00 |
| 1952 | 7,669.15 | (169.15) | 7,500.00 |
| 1953 | 7,611.98 | (111.98) | 7,500.00 |
| 1954 | 7,480.51 | (161.56) | 7,318.95 |
| 1955 | 5,291.34 | (58.08) | 5,233.26 |

In May 1954 Missisquoi received $9,128.58 in United States currency as proceeds of redemption by Paper of $9,000 (Canadian) face value of its debentures in accordance with the terms of the trust deed. The profit resulting from this redemption ($444.38) was treated as long-term capital gain on Missisquoi's 1954 income tax return.

In May 1955 Missisquoi received $15,196.87 in United States currency as proceeds of redemption by Paper of $15,000 (Canadian) face value of its debentures in accordance with the terms of the trust deed.

On October 13, 1955, Missisquoi received $123,000 in United States currency as the proceeds of its sale of $150,000 (Canadian) face value of the debentures of Paper to A. E. Osler & Co. of Toronto, Canada. On November 14, 1955, Missisquoi received $62,700 in United States currency as the proceeds of its sale of the balance of $76,000 (Canadian) face value of debentures of Paper to A. E. Osler & Co.

Missisquoi, in 1950, held and sold United States Government securities which were carried at a cost of $135,373 on its financial statement. On its December 31, 1951, financial statement, under "Current Assets," it listed "Marketable securities, at cost (at market value, $182,812.50) . . . 177,663.31."

Missisquoi's financial statements for December 31, 1950 through 1954, listed the Properties and Paper debentures as follows:

Other Assets:
Investment in 3% Sinking Fund Debentures, due April 1, 1961, of
St. Raymond Properties Limited (principal amount, Can. $250,000),
at cost_____ 240,625.00

The 1953 and 1954 financial statements listed the debentures as those of Paper, and the 1954 financial statement reflected the partial redemption by Paper in that year.

The financial statements of Missisquoi for the years 1950 through 1954 indicate it held no securities other than those discussed above as of December 31 in those years, except the stock of Fonda Container Company, Inc., its wholly owned subsidiary. Missisquoi's tax returns for 1952, 1954, and 1955 reflect no transactions in other securities during those years.

In 1952 Missisquoi completed a new powerplant costing $566,808.48 and sold all the securities which it appears to have owned, except the capital stock of Fonda Container Company, Inc., its wholly owned subsidiary, and the St. Raymond debentures. It reported gains and losses on the sales of these securities as capital gains and losses.

On February 28, 1952, Missisquoi borrowed $200,000 from Guaranty Trust Company on its promissory note with interest at 3¼ percent per annum, and it repaid this note on or about August 10, 1953.

On February 9, 1954, Missisquoi borrowed $300,000 from Guaranty Trust Company on its note with interest at 3½ percent per annum and on March 11, 1954, it borrowed an additional $200,000. The combined debt was paid off on or about August 16, 1954, at which time Missisquoi borrowed $250,000 at 3½ percent interest per annum from Standard Packaging Corporation, which owned nearly all of Missisquoi's capital stock. The loan from Standard was reduced to $125,000 on July 15, 1955, and the balance was paid on August 11, 1955.

Missisquoi's president, who at one time was a public accountant, considered the purchase of the debentures necessary for Missisquoi in order to insure a certain supply of unbleached sulphite pulp. He did not consider the income-producing factor of the debentures as a factor in their purchase. He did not want to invest in them, but he felt they were securities of good quality. According to its president, Missisquoi's management "considered these debentures to be in the nature of a capital asset" in the year 1954.

Missisquoi kept its books and reported its income for tax purposes on the accrual basis. Its books of account showed as an accrued expense for 1955 Vermont corporation franchise tax in the amount of $30,800 and it claimed this amount as a deduction on its income tax return for 1955.

Missisquoi paid the State of Vermont $28,000 on May 3, 1956, $1,-041.45 on July 26, 1956, and $706.57 on June 11, 1958, or a total of $29,748.02, in payment of its 1955 Vermont corporation franchise tax. Respondent disallowed $1,785.55 of the $30,800 claimed by Missisquoi as a deduction for Vermont corporation franchise tax on its 1955 return.

#### OPINION.

The first issue is whether the loss sustained by Missisquoi in 1955 on the sale of debentures of Paper, a supplier of some of its raw materials, was a capital loss, or a business loss or expense deductible in full. The debentures sold were acquired in 1952 in exchange for debentures of Properties which had been acquired by Missisquoi in 1950 primarily to assure itself of a steady flow of raw materials used in its business at a time when such raw materials were scarce.

Had Missisquoi sold these debentures, or had they become worthless, immediately after the reason for their acquisition ceased to exist, the answer would be relatively simple because it would be controlled by *Tulane Hardwood Lumber Co.*, 24 T.C. 1146 (1955), *Electrical Fittings Corporation*, 33 T.C. 1026 (1960), *Bagley & Sewall Co.*, 20 T.C. 983 (1953), affd. 221 F. 2d 944 (C.A. 2, 1955), and to some extent by *Corn Products Co.* v. *Commissioner*, 350 U.S. 46 (1955). See also *Smith & Welton* v. *United States*, 164 F. Supp. 605 (E.D. Va. 1958). But cf. *Exposition Souvenir Corp.* v. *Commissioner*, 163 F. 2d 283 (C.A. 2, 1947), affirming a Memorandum Opinion of this Court. The first-cited cases appear to establish the rule that if securities are purchased as a reasonable and necessary act in the conduct of a taxpayer's business and are so held at the time of their sale or other disposition, any loss incurred thereon may be deducted in full without specific consideration of the capital gains and loss provisions. Here we think the evidence establishes that the debentures in question were acquired in 1950 primarily for the purpose of assuring Missisquoi of a continuing supply of unbleached sulphite pulp which it then used in the manufacture of its product, paperboard, and that the acquisition was a reasonable and necessary act in the conduct of its business. The fact that the form of the debentures and the security behind them may have seemed to make them a fairly sound investment may have made it easier for Missisquoi's officers to enter into the transaction, but we do not think investment motivated the original transaction.

However, Missisquoi did not dispose of the debentures immediately after the reason for acquiring them ceased to exist. Rather, it held them for at least 3 years after its need for this assured supply of unbleached sulphite pulp vanished. The evidence as a whole, including the testimony of Missisquoi's president that the demand of the paperboard market changed in about 1952 to require the use of bleached rather than unbleached pulp and that unbleached pulp became available on the spot market at lower prices, and the fact that Missisquoi never did, and apparently no effort was ever made to force it to, take all of the unbleached pulp called for in the contract with Paper, indicate that the market situation which prompted Missisquoi to purchase these debentures as a business necessity changed soon after the contract was made and was no longer present after 1951. While the contract itself does not appear to require Missisquoi to hold the debentures for any period of time, we recognize that as a practical matter it may have been reasonably necessary for it to do so as long as the shortage of pulp continued. Compare *Smith & Welton* v. *United States, supra.*

But it is also recognized that the purpose for which property is owned and held can change; and the purpose for which property is

held and its character at the time of its sale are determinative of the effect of the sale for tax purposes. *Carl Marks & Co.*, 12 T.C. 1196 (1949); *Gulftex Drug Co.*, 29 T.C. 118 (1957), affirmed per curiam 261 F. 2d 238 (C.A. 5, 1958). This rule would appear to be particularly apt in the present situation where the debentures clearly fall within the definition of capital assets contained in section 1221 of the Internal Revenue Code of 1954,[1] absent the business purpose in acquiring them. If the underlying business reason for acquiring the securities ceases to exist, unless the securities are sold or disposed of within a reasonable time thereafter, their character in the hands of the holder must be determined under the law without the cloak of the business purpose for which they were originally acquired. True, there may be some other business reason for continuing to hold the securities which would permit ignoring the capital gains and loss provisions, but absent such a reason the character of the securities and the tax treatment of a loss suffered on their sale or other disposition must be viewed in the light of sections 1221 and 1211. If they do not then fall within one of the exclusionary clauses of section 1221, they are capital assets and the deduction of losses thereon is limited by the provisions of section 1211 without the necessity of determining that they were held as an investment.

The debentures here involved did not fall within any of the exclusionary clauses of section 1221 at the time they were sold in 1955. They were not stock in trade nor property of a kind which would properly be included in inventory, nor property held primarily for sale to customers in the ordinary course of Missisquoi's trade or business, nor were they depreciable property or real property used in its trade or business. Hence, they were capital assets, and the loss on their sale in 1955 is limited by the provisions of section 1211.

Petitioner's principal argument is that there was no market for these debentures prior to the time they were sold in 1955 and that they should retain their character as assets acquired in the ordinary course of its business until a buyer could be found, presumably at a reasonable price. Even if we were to accept this argument, we do not think the evidence supports petitioner's contention.

The business necessity for Missisquoi to acquire and hold these debentures ceased to exist at least by the end of 1951. Petitioner's former president testified that beginning in 1952 he made efforts to sell the debentures by inquiry through brokerage houses in Canada and a friend of his on the board of directors of Paper, but could find no purchaser until 1955. There is no evidence of the terms upon which Missisquoi was willing to sell. These debentures were paying 3-percent interest and the interest payments were being met each year.

---

[1] All section references are to the Internal Revenue Code of 1954.

Petitioner's president thought these debentures were a reasonably sound investment in 1950 and there is no convincing proof that they were any less sound thereafter. Some of the debentures were redeemed at par in 1954 and there is some meager evidence that some of the debentures had been disposed of by one or two other holders sometime prior to 1955. There is little concrete evidence that petitioner made very exhaustive efforts to dispose of the debentures prior to 1955 and their retention as an investment is not inconsistent with petitioner's past history of investing in Government bonds and other securities. Furthermore, the debentures were carried on Missisquoi's books as an investment and the gain realized on the redemption of some of the debentures in 1954 was reported for tax purposes as long-term capital gain. While perhaps none of these factors, taken alone, would prove that Missisquoi was holding these debentures for investment purposes, they are evidence that they were being held for that purpose and they tend to negate petitioner's contention that they were being held only until a buyer could be found. While it may have been a sounder business tactic to hold these debentures until a better price could be obtained for them rather than to dump them at a loss within a reasonable time after the necessity for holding them ceased, we do not think this is the type of business activity which permits ignoring the capital gains and loss provisions.

In our opinion, this case is more similar to *Gulftex Drug Co.*, *supra*, wherein the securities were held a considerable time after the purpose for which they had been acquired was accomplished, than to the cases relied on by petitioner and cited above, wherein the securities acquired were disposed of immediately after the business need terminated. We said in *Gulftex*, "when it [petitioner] held the stock beyond a reasonable time, after exercising the whiskey-purchasing privileges, it deprived itself of the benefit of the type of deduction allowed in the cases cited and relied upon by it." We think the same reasoning applies here. We conclude that Missisquoi's loss on the sale of the debentures in 1955 was a capital loss.

The second issue is whether respondent erred in disallowing a portion of the $30,800 deducted by petitioner on its 1955 return as accrued Vermont corporation franchise tax for the year 1955. Petitioner's books of account show an accrued expense for 1955 Vermont franchise tax in the amount of $30,800, and it deducted that amount on its return for 1955. Petitioner paid $28,000 on this tax on May 3, 1956, $1,041.45 on July 26, 1956, and $706.57 on June 11, 1958, or a total of $29,748.02. Respondent disallowed $1,785.55 of the amount claimed, thereby allowing the total of the two payments made in 1956. Petitioner does not contest disallowance of the difference between the amount claimed and the total payments actually made ($1,051.98),

but does contest disallowance of the $706.57 paid in 1958. The burden of proof is on petitioner to show that respondent's determination is erroneous. *Welch* v. *Helvering*, 290 U.S. 111 (1933); *Joseph V. Moriarty*, 18 T.C. 327 (1952), affirmed per curiam 208 F. 2d 43 (C.A.D.C. 1953). In general, a deduction is accruable when the liability becomes fixed and the amount is reasonably ascertainable. *Globe Tool & Die Manufacturing Co.*, 32 T.C. 1139 (1959); *Lucas* v. *American Code Co.*, 280 U.S. 445 (1930). When a tax liability is being contested it is not so certain or ascertainable in amount as to permit its accrual until the termination of the controversy. *Globe Tool & Die Manufacturing Co., supra; Dixie Pine Co.* v. *Commissioner*, 320 U.S. 516 (1944). No evidence was presented on this issue except the stipulated fact that petitioner accrued $30,800 on its books and claimed that amount on its return. We do not know what the situation was at the end of 1955, nor why only $29,748.02 in Vermont tax for 1955 was finally paid, nor why the $706.57 was not paid until 1958. Petitioner has failed to carry its burden of proof on this issue and respondent's determination must be approved. See *Gunderson Bros. Engineering Corp.*, 16 T.C. 118 (1951).

*Decision will be entered for the respondent.*