**JOHN J. GRIER CO., a Missouri corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 61 C 1916.**

United States District Court
N. D. Illinois, E. D.
April 25, 1963.

Daniel D. Glasser, Chicago, Ill., for plaintiff.

James P. O'Brien, U. S. Atty., Chicago, Ill., Louis F. Oberdorfer, Asst. Atty. Gen., Edward S. Smith, David A. Wilson, Jr.,

Donald R. Anderson, Attys., Dept. of Justice, of counsel, for the Government.

WILL, District Judge.

This is an action to recover federal income and excess profits taxes for the calendar years 1955, 1956 and 1959, assessed and collected allegedly erroneously and illegally by the Commissioner of Internal Revenue. The Court's jurisdiction is based on section 1346 of Title 28, United States Code.

The parties have entered into a stipulation of facts with respect to the years 1956 and 1959 which they have submitted to the Court. Furthermore, they have agreed that, if the Court determines that plaintiff is entitled to judgment in its favor, the parties will attempt to resolve between themselves the amount of the refund to which plaintiff is entitled, referring the matter to the Court only if they are unable to reach an accord.[1]

The facts, except where noted, are undisputed. Plaintiff, a Missouri corporation, has, since its incorporation in 1907, been engaged in the operation of restaurants and other eating establishments. Until 1956, all of these establishments were located in or adjacent to railroad stations. Noting a decline in revenue and profits commencing in 1953, apparently due to diminished railroad passenger traffic, plaintiff's directors began to consider diversification of its business activities within the restaurant industry.

In February, 1956, plaintiff learned that a roadside restaurant, cocktail lounge and bar, located in Palatine, Illinois, and known as the Evergreen Supper Club, was for sale. Negotiations for purchase of this supper club were had with its purported owner, Paul A. Peterson, and were substantially concluded when he first revealed that (1) the club was owned not by him but by a corporation, the Evergreen Supper Club, Inc. (henceforth sometimes referred to as the "Evergreen corporation") of which he was the sole stockholder, (2) the restaurant stood on premises leased to the Evergreen corporation,[2] and (3) the lessor was unlikely to consent outright to an assignment of the lease. However, Peterson advised plaintiff that obtaining of the lessor's consent was unnecessary if plaintiff purchased the corporation itself, rather than the assets of the supper club. Plaintiff took Peterson's suggestion and, in March, 1956, bought from him for $89,982.64 all of the stock of the Evergreen corporation. Prior to this purchase, plaintiff did not inquire of the lessor or his representative whether the lessor would in fact object to such an assignment. There is no evidence that plaintiff paid any more for the stock than it would have paid for the assets alone[3] for it appears that the Evergreen corporation owned no assets other than those directly related to the supper club's operation.

The lease is dated September 15, 1952. It was to run for 7½ years, and the lessee had an option to renew for an additional 2½ years without any increase in rent. Paragraph 7 of the lease provides, in pertinent part, as follows:

"Lessee will not allow said premises to be occupied, in whole or in part, by any other person, and will not sublet the same, or any part thereof, except for the use of the upstairs apartment and rooms by the personnel employed in said business, nor assign this lease without the written consent in each case of the Lessors first had, and will not permit any

---

1. The Court is not asked to rule on the validity of the Commissioner's assessment of a deficiency for 1955 of $415.22 in tax and $25.95 in interest alluded to in the stipulation but as to which no facts have been presented.

2. In 1952, the named lessee, Evergreen Radio Club, Inc., changed its name to Evergreen Supper Club, Inc.

3. Plaintiff states, Brief p. 2, that the price which it was to pay for the assets had been determined before Peterson revealed the existence of the Evergreen corporation, and that the price plaintiff did pay for the stock was identical to what it had agreed to pay for the assets. This statement is not contested by the defendant.

transfer, by operation of law, of the interest in said premises acquired through this lease, * * *."

Upon taking possession, plaintiff changed the name of the club to the Grier Supper Club, but the type of food and service offered remained substantially the same. Although none of the employees of the Grier Club, including its resident manager, were taken from plaintiff's then existing personnel, all employees were paid directly by plaintiff. The latter's profit-sharing and hospitalization plans were amended to include employees of the Grier club. In addition to paying salaries of the club's employees, plaintiff paid directly all trade account and miscellaneous expenses incurred by the club. Gross receipts from the club were deposited in its accounts, but at regular intervals funds from these accounts were transferred to plaintiff's general account. Plaintiff appointed its vice-president, W. C. Darnell, Jr., to be responsible for the operation of the Grier club. On its books of account, plaintiff carried the cost of its purchase of the Evergreen stock as "investment, Grier's Supper Club * * *."

The Evergreen corporation filed separate federal income tax returns as follows:

| Year Ending | Taxable Income | Depreciation of Restaurant and Bar Equipment | Amortization of Leasehold Facilities |
|---|---|---|---|
| 8/31/56 | $ 6,518.54 | $6,235.98 | $4,097.30 |
| 12/31/56 | 2,230.32 | 1,427.00 | 971.00 |
| 12/31/57 | 6,342.70 | 4,710.00 | 3,317.00 |
| 12/31/58 | (11,968.49) | 4,848.00 | 3,444.00 |
| 12/31/59 | (11,680.92) | 4,848.00 | 3,444.00 |

Between August 31, 1956 and December 31, 1958, depreciable restaurant and bar equipment was increased by approximately $4,000 (cost) and leasehold equipment was increased by approximately $3,000 (cost).

In 1959, plaintiff sold the Evergreen stock to the lessor for $14,209.12, and in its 1959 federal income tax return plaintiff claimed as an *ordinary* loss deduction the sum of $75,773.52, the difference between what it paid for the stock initially and the proceeds of its sale. Plaintiff sought to carry this loss back in full to 1956, and thereby to reduce that year's tax, but the Commissioner determined that the loss arose from the sale of a *capital asset*, and consequently he disallowed the carryback. He assessed a deficiency of $7,437.09 in tax and $388.97 in interest for 1956, and $26,049.-92 in tax and $1,042.00 in interest for 1959, or a total of $34,917.98. Plaintiff paid $34,826.49 of this sum and filed a timely claim for refund. It was disallowed in September, 1961, and this litigation ensued.

There is only one issue before the Court: did the sale by plaintiff of the Evergreen stock give rise to a capital or an ordinary loss, i. e., was this a sale of a capital or of a non-capital asset. A "capital asset" is defined in section 1221 of the Internal Revenue Code, 26 U.S.C., as "property held by the taxpayer (whether or not connected with his trade or business)" but excluding

"property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167 * * *."

■■■ While corporate stock is ordinarily classified as a capital asset, it is not invariably so classified. When stock is purchased and retained by a taxpayer as an incident to the conducting of its business, and not for investment purposes, its sale results in ordinary gain or loss. Gulftex Drug Co., 1957, 29 T.C. 118, 121, aff'd. 5 Cir.1958, 261 F.2d 238

(per curiam). To determine a taxpayer's motives, his conduct must be examined for substance rather than form, and the surrounding circumstances must be weighed as well. Smith & Welton, Inc. v. United States, D.C.E.D.Va.1958, 164 F.Supp. 605, 608. Among the factors which must be considered are the attractiveness of the stock to one not primarily interested in obtaining and retaining the underlying assets and whether the stock is held longer than non-investment purposes require. Id., 164 F.Supp. at 610.

■ Since plaintiff had been informed that the lessor might refuse to approve an assignment of the lease, the Court must conclude that plaintiff had good reason to believe that possible objections to such an assignment could be avoided by purchase of the corporation's stock rather than its assets. Furthermore, the lessee was obligated by a provision of the lease not to permit a transfer by operation of law of the leasehold interest. Consequently, an attempted assignment, via either a liquidation of the Evergreen corporation or merger of it with plaintiff, could reasonably have been expected to have been met with the same objections by the lessor that plaintiff feared at the time it elected to purchase the Evergreen stock. As a result, plaintiff cannot be said to have retained the corporate form for any longer period than seemed necessary.

Plaintiff was in the business of operating eating establishments. After purchasing the Evergreen corporation, plaintiff managed the supper club in a manner not shown to vary materially from the way it would have operated the club absent its corporate shell. Moreover, the Evergreen stock had no value to anyone not interested in operating the supper club since the corporation owned it and nothing more.

In the light of all these considerations, there can be little doubt that plaintiff purchased the stock incidentally to the conduct of its business, and not for investment, and that it held the stock only as long as was necessary in order to operate the supper club. Its ownership and sale of the securities were incident to plaintiff's business and the loss must be deemed to have been an ordinary loss. Cf. Western Wine & Liquor Co., 1952, 18 T.C. 1090, 1099, pet'n for review dismissed, 8 Cir.1953, 205 F.2d 420.

■ Defendant emphasizes that the stock was carried on plaintiff's books as an "investment". But it is clear that this fact, although probative, is not conclusive evidence that the stock constituted, for tax purposes, a capital asset. See Smith & Welton, Inc. v. United States, supra, 164 F.Supp. at 608. Moreover, the Government's contention that operations of the Grier Supper Club were not "closely geared" or "important" to plaintiff's other activities—even if true—is beside the point. No cases are cited, nor have any been found, holding or implying that a corporation's activities which involve considerable time and effort, and which are similar if not identical to its other operations, are not incidents of its business merely because they are not "closely geared" or "important" to other corporate activities. If plaintiff had purchased and sold the physical assets of the supper club, rather than its corporate stock, the loss incurred would have been ordinary loss since such assets constituted depreciable property used by plaintiff in its trade or business.

■ The loss which plaintiff realized upon its sale of the Evergreen stock was ordinary, not capital, loss. Accordingly, it was entitled to carry the loss back. 26 U.S.C. § 172. The amount of plaintiff's loss on its sale of this stock is properly computed by deducting plaintiff's proceeds on its sale from its adjusted basis of the stock. The adjusted basis is its cost plus capital improvements made on the Evergreen assets less depreciation and amortization taken thereon.

Within 30 days, the parties shall report to the Court on their progress toward resolution of all remaining questions, and within that time plaintiff shall present an order for entry consistent herewith.