**SCHLUMBERGER TECHNOLOGY CORPORATION**

v.

**UNITED STATES of America.**

Civ. A. No. 66-H-476.

United States District Court
S. D. Texas,
Houston Division.

Nov. 12, 1969.

George H. Jewell, Jr., and Wm. C. Griffith, Baker, Botts, Shepherd & Coates, Houston, Tex., for plaintiff.

Morton Susman, U. S. Atty., Mitchell Rogovin, Asst. Atty. Gen., John O. Jones and Robert L. Trimble, Attys., for Tax Division, Dept. of Justice, Washington, D. C., for defendant.

*Memorandum and Order*

SINGLETON, District Judge.

This case was tried before the Court. It is a civil action for recovery of federal income taxes and interest paid by Schlumberger Well Surveying Corporation (SWSC) for the year 1962. On April 1, 1966, SWSC was merged into Schlumberger Technology Corporation and it, as plaintiff, brings this suit as statutory successor to SWSC. For the year 1962, the District Director of Internal Revenue determined that SWSC had net taxable income of $16,879,042.24 and assessed taxes of $8,463,007.77. Plaintiff contends that for such year SWSC's correct taxable income was $10,753,198.24 and that its correct income tax liability was $5,277,568.89. Consequently, plaintiff seeks the recovery of taxes allegedly overpaid in the amount of $3,185,435.88 plus assessed and statutory interest as provided by law. All procedural requirements set forth in sections 7422 and 6532 of the Internal Revenue Code of 1954 and applicable regulations thereto have been complied with. This Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. § 1346(a). Venue is properly in this Court pursuant to 28 U.S.C. § 1402.

The stipulated issues are:

(a) Whether unrepaid advances made by SWSC to Computer Systems, Inc. (CSI) in the amount of $3,050,000 and to American Systems, Inc. (ASI) in the amount of $307,594 are deductible by SWSC as bad debts under section 166 of the 1954 Code, or are deductible only as capital losses under section 1232(a) of the 1954 Code, and

(b) Whether the $2,768,250 loss realized by SWSC upon the disposition of its ASI stock should be treated on the one hand as a loss from the sale of a capital asset, or on the other hand, either as a loss not from the sale or exchange of a capital asset, or as an ordinary and necessary business expense.

This Court has concluded and finds that the unrepaid advances made by

SWSC to CSI in the amount of $3,050,000 is deductible as a bad debt under section 166 of the 1954 Code; that the unrepaid advances made by SWSC to ASI in the amount of $307,594 are deductible only as a capital loss under section 1232 (a) of the 1954 Code; and that the $2,768,250 loss realized by SWSC upon the disposition of its ASI stock should be treated as a loss from the sale of a capital asset.

The primary business of SWSC and its predecessors was and is the service and system of detection, measurement, transmission, and analysis of formations and chemistry in the depths of the earth originally and primarily for aid in the discovery of oil, gas, and other minerals. Through extensive and continued research and development, SWSC has over the years discovered new methods of measurement, and developed new equipment, all designed to increase the amount of information which can be obtained about the formation and chemistry of the earth. To maintain the quality of its measurements, SWSC has found it necessary to design and manufacture its own equipment. In part, this is due to the specialized nature of its operation and the high degree of precision required, and in part due to the high degree of reliability which must be built into the equipment to operate under the extreme conditions of temperature, humidity, transportation, and rough handling to which it is subjected. In this field of business endeavor, the advance of electronics, particularly in connection with the transmission and analysis of formations, became significant to SWSC. Therefore, it was a natural advance or extension and improvement of the business of SWSC to get into that part of the electronic field that would aid in the detection, measurement, transmission, and analysis of formations in the earth. As the electronic field became more sophisticated, in the sense that the commercial aspects of this field of endeavor gained significance, particularly with the advent of the computers, such commercial aspects of the electronics field would be directly related to SWSC's business. Therefore, the advance into the electronics and representative fields of business endeavors by SWSC would be an integral part of its business and designed to protect and improve its original and primary purpose.

In 1956 Electro-Mechanical Research, Inc. (EMR) was a wholly owned subsidiary of SWSC. EMR had been formed during World War II by SWSC personnel to use SWSC's induction logging principles and techniques in the development of a workable mine detector for use by allied forces. Because, and only because, SWSC was owned principally by French nationals, it was necessary for EMR to be formed as a separate corporation with voting control in American citizens in order to obtain U. S. security clearance. Following the war, EMR continued in the measurement business by using SWSC's and its own expertise and research to develop telemetry devices and related measurement components for use by military and space agencies. After several unsatisfactory alternatives were tried, the U. S. security clearance problem was ultimately solved by having all of the stock of EMR beneficially owned by SWSC but with voting control placed in American citizens by use of a voting trust.

Throughout its operations EMR has been engaged in essentially the same measurement business as SWSC. While SWSC was primarily concerned with measurement below the earth, EMR was primarily concerned with measurement above the earth for use by military and space agencies. Therefore, EMR was and is an integral part of SWSC's business.

Because SWSC's and EMR's scientific personnel lacked sufficient depth in computer technology to fulfill their needs, SWSC looked elsewhere for help. It believed that such help could be obtained from CSI. Before 1959 CSI was a corporation unrelated to SWSC or EMR, and

was primarily engaged in the development, manufacture, and sale of analog computers and in analog and digital computer research. CSI had not developed any commercially acceptable computers, had just undergone bankruptcy reorganization, and was badly in need of money for continuing operations, and had highly experienced scientific and technical teams which were abreast or ahead of the field in computer technology.

On or about May 19, 1959, SWSC subscribed to 840,000 shares of the common stock of CSI, representing 80% of its stock, for $1,521,000 cash. The balance of the stock was owned by key employees of CSI and by an investment group who were unwilling to sell their shares. Because CSI was also involved in matters requiring U. S. security clearance, SWSC contributed the CSI stock to EMR so that voting control of CSI would reside in American citizens by use of the voting trust. In 1960 an additional $1,000,000 was contributed by SWSC to EMR to permit EMR to contribute such amount to the capital stock of CSI. When CSI needed additional funds for operating expenses, SWSC made a series of short term loans to CSI on ten different occasions beginning on July 15, 1960 and ending November 1, 1961, which in the aggregate totaled $3,200,000. For the purpose of evidencing these loans, CSI at the time or shortly after each loan was made delivered a ninety day note to SWSC for the purpose of evidencing the amount of the loan, the rate of interest, and the due date. SWSC's purpose in acquiring the CSI stock and in making the loans to CSI was to obtain the computer expertise and specialized computer capability needed in the various phases of the measurement business in which SWSC and EMR were then engaged; therefore, the entry or advance into CSI's computer expertise and specialized computer capabilities was an integral part of SWSC's business and designed to protect and improve its original and primary purpose of providing a service and system of detection, measurement, transmission, and analysis of formations and chemistry in the depths of the earth. As this Court has previously found, since the operations of EMR were an integral part of the business of SWSC, the acquisition of the CSI stock and the CSI debt were likewise integral and necessary acts in the conduct of SWSC's business, and in connection with these transactions relating to CSI, SWSC was not motivated by an investment purpose.

However, CSI was not able to develop an acceptable analog computer and subsequent scientific developments indicated that the need for computer analysis in the measurement systems of SWSC and EMR could be better fulfilled with digital computers rather than analog computers. By late 1961, SWSC believed that it had obtained sufficient digital expertise so that it no longer needed CSI. At this time CSI was hopelessly insolvent and CSI's stock was completely worthless and CSI's debt to SWSC was for all practical purposes worthless.

As noted above, SWSC acquired 80% of the stock of CSI and had been unable to acquire the remainder of the stock which was owned by key employees of CSI and by an investment group who was not willing to sell at the time of the original acquisition by SWSC. Consequently, there existed the continuing possibility of suits by minority stockholders of CSI and this threat prevented SWSC from acting in a manner that it could have acted had it owned all of the stock. At this time SWSC accepted a proposition from one Robert Haskins to acquire the CSI stock for $10 and to contribute $150,000 to CSI to keep CSI in operation for at least six months, such offer being conditioned upon SWSC's agreement to compromise its $3,200,000 debt with CSI for $150,000. SWSC accepted this proposition and on February 27, 1962, CSI delivered $150,000 to SWSC and SWSC agreed to accept such amount in full discharge of the $3,200,000 debt

and surrendered to CSI all notes evidencing such debts; and on this date Haskins acquired all of the CSI stock from EMR for $10.00.

In March of 1960 SWSC purchased for $1,550,000 250 shares of Class A common stock of ASI and 15,000 shares of its preferred stock. Subsequently, an additional $1,253,750 was paid by SWSC for additional shares of ASI stock, and SWSC made short term advances to ASI in the total amount of $750,000 and received therefor interest bearing notes from ASI in the principal amount of $750,000.

ASI was engaged in designing, developing, manufacturing, and programming electronic systems primarily for governmental use. Because of unexpected adverse business conditions and ASI's failure to obtain governmental systems contracts, ASI was by February 1962 on the verge of bankruptcy. On March 2, 1962, SWSC sold its ASI stock to Teledyne, Inc. for $500.00. At this time, as a result of mutual offsets, the amount owing by ASI to SWSC was $610,778.00. SWSC and ASI entered into an agreement relating to this indebtedness, whereby ASI's notes were retired upon payment to SWSC of $300,000. The business of ASI was not directly related to the business of SWSC, and the advance by SWSC into ASI's business was not designed to protect and improve the original and primary business of SWSC and did not aid SWSC in its primary business of providing a service and system of detection, measurement, transmission, and analysis of formations and chemistry in the depths of the earth, nor did it aid SWSC to maintain and improve the quality of this business.

■ Accordingly, the conclusion is inescapable that SWSC acquired ASI stock and advanced sums to ASI as an investment and not as an integral and necessary act in the conduct of SWSC's business. Therefore, the investment of SWSC in the ASI stock and the ASI notes was not an ordinary and necessary expense of SWSC, and SWSC's losses on the ASI stock and the ASI notes were capital losses and deductible only as such.

■ In determining the answers to the stipulated issues, it was necessary to first determine whether or not the ASI stock and debt and the CSI debt, or any of them, constituted capital assets or non-capital assets under the provisions of the 1954 Code. In making this determination, this Court is of the opinion that the applicable legal test is most understandably stated in Booth Newspapers, Inc. v. United States, 303 F.2d 916, 157 Ct.Cl. 886 (1962). In that case the United States Court of Claims held as follows:

" * * * If securities are purchased by a taxpayer as an integral and necessary act in the conduct of his business, and continue to be so held until the time of their sale, any loss incurred as a result thereof may be fully deducted from gross income as a business expenses or ordinary loss. If, on the other hand, an investment purpose be found to have motivated the purchase or holding of the securities, any loss realized upon their ultimate disposition must be treated in accord with the capital asset provisions of the Code.

"Thus, the circumstances of the transaction (its factual background, the necessities of the particular business involved at the particular time involved, and the intentions of the taxpayer, both at the time the securities were originally purchased and at the time they were disposed of) are of crucial importance in the resolution of these cases. The fact that securities are 'property,' in the broad sense of that term, is not conclusive."

To the same effect, see also Corn Products Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955); John J. Grier Co. v. United States, 328 F.2d 163 (7th Cir. 1964); Electrical Fittings Corporation,

33 T.C. 1026 (1960); Pittsburg Reflector Co., 1968 P.–H. Tax Ct. Mem. ¶ 18,075 (Apr. 25, 1968); Helen M. Livesley, 19 C.C.H. Tax Ct. Mem. 133 (1960).

Applying this test to the facts surrounding the CSI debt, this Court concludes that this debt was not a capital asset in the hands of SWSC within the meaning of section 1232(a) of the 1954 Code, and, therefore, the difference between the face amount of this debt and the amount repaid is deductible as a bad debt under section 166(a) of the 1954 Code. Having so concluded, it is not necessary to determine the question of whether or not the compromise of such debt would otherwise come within the purview of section 1232(a). Therefore, the unrepaid advances made by SWSC to CSI in the amount of $3,050,000 is deductible as a bad debt under section 166 of the 1954 Code.

On the other hand, this Court concludes that the ASI stock constituted a capital asset in the hands of SWSC and that the loss realized on its disposition is deductible only as a capital loss and that the ASI debt constituted a capital asset in the hands of SWSC and the compromise of the debt was a retirement of an evidence of indebtedness within the meaning of section 1232(a) of the Code, and such loss is deductible only as a capital loss. Therefore, the unrepaid advances to ASI in the amount of $307,594.00 are deductible by SWSC only as a capital loss under section 1232(a) of the 1954 Code, and the $2,768,250.00 loss realized by SWSC upon the disposition of its ASI stock is a loss from the sale of a capital asset and deductible only as such.

This will constitute this Court's findings of fact and conclusions of law.

The parties are directed to compute the amount of the refund to which plaintiff is entitled and submit an approved form of judgment to this Court for its signature and entry.