## MUNSON v. COMMISSIONER OF INTERNAL REVENUE.
### No. 35.

Circuit Court of Appeals, Second Circuit.
Dec. 5, 1938.

Newton.K. Fox, of New York City, for petitioner.

James W. Morris, Asst. Atty. Gen., and Sewall Key and Robert N. Anderson, Sp. Assts. to Atty. Gen., for respondent.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The petitioner Munson was a bond and stock broker from 1915 to December 31, 1928. On July 1, 1925, he and one Adrian agreed in writing to form a partnership "for the transaction of the business of brokers and dealers in stocks, bonds and other securities, under the firm name of Munson & Adrian" and to divide all profits and losses equally. While there was no provision in the agreement for a capital contribution by Munson he contributed $50,000 in cash plus certain securities. By 1928 his capital contributions had increased to $100,-000. He also furnished about 98% of the customers. Adrian contributed to the partnership a seat on the New York Stock Exchange which he had purchased for $96,000 in 1924. It was of like value at the time when the partnership was formed and was so set up on the books of the firm. Either partner could terminate the agreement by giving ten days' notice in writing to the other.

It was provided in the articles of partnership that the Stock Exchange seat of Adrian should be carried on the firm books at $96,000 but that in the event of dissolution such membership should be "sold or retained" by him "at his option"; that if sold, the gain or loss, being the difference between the sale price and the cost value, should be apportioned between the partners; that if retained by Adrian the difference between the liquidating value and the cost value should be equally divided between the parties, and that, if the liquidating value should "show a substantial profit", Adrian might discharge his obligation to Munson by annual payments of $10,000 plus interest.

To comply with regulations of the Stock Exchange the parties, on November 1, 1927, entered into a supplemental agreement which confirmed the original partnership articles and provided in addition that Adrian "by contributing the use of his membership in the New York Stock Exchange * * * expressly agrees that in so far as it is necessary for the protection of the creditors of said partnership said membership shall be an asset of said partnership."

On June 12, 1928, Munson and Adrian entered into an agreement to terminate the partnership at the end of the month which provided that "with reference to the New York Stock Exchange membership of the party of the second part (Adrian) the liquidating value" was to be determined by the sale price of other Stock Exchange memberships. By the agreement Adrian elected to retain his membership, acknowledged "his personal indebtedness" to Munson in a sum equal to 50 per cent of the difference between $96,000 and the liquidating value of the membership and agreed "to pay and satisfy the * * * indebtedness" in annual instalments of $10,000 each with interest.

Munson's one-half of the increment in value of the membership amounted to $130,750. Accordingly Adrian paid him $10,000 in each of the years 1928 and 1929 and the balance, or $110,750, in 1930.

In Munson's 1928 return, which was made on a cash basis, he included his share of the firm profits realized from sources other than the Exchange membership, but did not include the $10,000 of profit thereon received from Adrian that year because counsel had advised him that his profit on the membership was not taxable until he had received the full amount of $130,750. The Commissioner thereafter, with the consent of Munson, assessed the $10,000 paid in 1928 as part of the income for that year and an additional tax of $1,745.59 was paid therefor. He included the $10,000 received in 1929 in his return for 1929. He likewise included the $110,750 paid in 1930 in his return for 1930, less $2,500 paid as counsel fees, namely, $108,250 and paid a tax on it as capital gain at 12½%. In his return for that year was the following statement:

"In settling the affairs of Munson & Adrian, members of the New York Stock Exchange, a profit or loss on the seat was to be divided equally between the two partners. There was a profit of $261,500, fixed by the Arbitration Committee of the Exchange. My share of the profit was $130,-750, less counsel fees of $2500. In 1928, I received $10,000 and in 1929, $10,000, as shown in my tax returns for those years. The remaining $110,750, I am reporting on this return. Counsel fees of $2,500 were paid by me on December 1, 1930."

The Commissioner held that the item of $108,250 was taxable as ordinary income at normal and surtax rates, disallowed the deduction of $4500 which Munson had claimed in his return on account of an investment in the Wild Elk Conservation Range of Montana, said to have become worthless in 1930, and assessed a deficiency of $2,577.75 which the Board of Tax Appeals sustained. The Board reached the conclusion that the item of $108,250 was taxable at normal and surtax rates because it was income resulting from the payment of Adrian's personal indebtedness to Munson and not from any gain realized by the partnership.

Thereafter the taxpayer filed a claim for the refund of all taxes paid for the year 1930, namely, of $11,363.02, on the ground that he had erroneously reported $108,250 as income for that year, when it represented income for the year 1928. The refunding claim was disallowed by the Commissioner.

The questions before us are:

1. Whether the sum of $108,250 paid the taxpayer by Adrian in 1930 in connection with the retention by the latter of the membership in the New York Stock Exchange was taxable in that year, or in 1928?

2. Whether the sum of $108,250 was taxable at 12½% as a capital gain or as ordinary income at normal and surtax rates?

3. Whether the taxpayer sustained a deductible loss of $4500 in 1930 on account of his investment in the Wild Elk Conservation Range of Montana?

We think that the Board was right in holding that the $108,250 paid to Munson by Adrian in 1930 was taxable in that year, and not in 1928. It is true that under Section 182(a) of the Revenue Act of 1928, 26 U.S.C.A. § 188, Munson, in computing his net income, was required to include his distributive share of firm income for that year "whether distributed or not", but he made no attempt to show that the books of the partnership were kept on an accrual basis so that the gain from the Stock Exchange seat would all be income to the partnership during 1928 rather than in the years when the payments were made.

The Board erred in holding that the sum was ordinary income taxable at normal and surtax rates, rather than a capital gain taxable at 12½%. The result reached depended on the correctness of the conclusion of the Board that the $108,250 was income resulting from the payment of Adrian's personal indebtedness to Munson and not from gain realized by the partnership through the disposition of the Stock Exchange seat.

The original articles of partnership provided that the membership in the New York Stock Exchange should be carried on the firm books at a cost value of $96,000, as was in fact done, and went on to provide for crediting to the parties in equal portions the gain which might be realized by Adrian, who had the legal title. The supplemental agreement of November 1, 1927, provided that Adrian, "by contributing the use of his membership in the New York Stock Exchange, hereby expressly agrees that in so far as it is necessary for the protection of the creditors of said part-

nership said membership shall be an asset of said partnership."

It seems plain that under the terms of either or both of the agreements of partnership the equitable title to the seat was in the firm. Whether it was a capital asset depended on the agreement of the parties. Matter of Hearns, 214 N.Y. 426, 108 N.E. 816; In re Amy, 2 Cir., 21 F.2d 301, 303; In re Swift, 118 F. 348, D.C.Mass. The original articles provide that: "All profits and losses shall be apportioned equally", and go on to set forth the mode of computing the profit on the seat in the event of the liquidation of the firm. In determining whether the seat was a firm asset it could make no difference whether it was sold to a third party, as might have been done, or was retained by Adrian under an agreement to account for the increment in excess of the value of $96,000 at which it was originally contributed. After the arbitration committee of the Exchange had estimated the profit at $261,500 it became quite unnecessary formally to credit Adrian with receipt of the seat in payment both of his capital contribution of $96,000 and of his share in the gain realized and then to pay Munson $130,750 less $2,500 expended for counsel fees, on account of his share of the profits. Under the partnership articles Munson was bound to accept Adrian's agreement to pay the former's share of the gain instead of getting it at once from the firm in cash. But this agreement was plainly in lieu of an income distribution by the firm. In other words, Munson obtained $10,000 in 1928, $10,000 in 1929, and $108,250 in 1930 as a profit realized from the sale to Adrian of his equitable interest in the Stock Exchange seat. It is true that a Stock Exchange seat may merely be used by a firm and not belong to it either at law or in equity, but when it was set up on the firm books in the capital account, was contributed under a partnership agreement to share profits and losses, including among other profits those realized from the advance in the value of the seat, we think it became a capital asset. The agreement to share profits and losses on a seat is inconsistent with any reasonable theory that it was not a capital asset. The seat was available to creditors under the Articles of 1925. The supplemental agreement of 1927 specifically making it subject to the claims of creditors was only made to comply with a rule of the Stock Exchange.

It is contended that the taxpayer could not elect to have the capital gain received by him in 1930 taxed at 12½% under Section 101(a) of the Revenue Act of 1928, 26 U.S.C.A. § 101, for the reason that he had not complied with the direction of Section 186 of the Revenue Act of 1928, 45 Stat. 841, and the regulations promulgated thereunder (See Regulations 74 Art. 931) by filing a partnership return showing all items of capital gain, capital loss and capital deductions and the names of the members and the amounts of their respective shares in such capital net gain or capital net loss. We think, however, that Section 186 and the regulations referred to called for no more than an information return and were not limitations upon the right of the partner to take advantage of the rate of taxation upon capital net gain afforded him under Section 101(a).

The remaining question is as to the right of the taxpayer to deduct $4,500 as a loss incurred in 1930 through his investment in the Wild Elk Conservation Range of Montana. In the summer of 1928 he visited the range and found that the elk were starving to death and was told that there were forty or fifty carcasses on the hillside. He thereupon purchased a carload of wire so as to confine the elk in a place that would furnish better pasture. He got reports "between 1930 and 1928 or 1927" that the authorities had cut the wire and turned the starving elk out. He testified that he did not think "there was any value left * * * after the stock had been turned loose and roamed at large." Another stockholder named Barnes invested $3,500 in the range during 1930 in an effort to sell additional shares and thereby revive the enterprise. No showing was made that it ever revived, or that it had not become worthless before 1930. The Board was justified in holding that it could not determine the year in which the taxpayer's interest in the range became worthless, and, therefore, properly refused to allow the deduction of $4500 from his income for the year 1930.

Order reversed and proceeding remanded with directions to compute the tax in accordance with the views set forth herein.