**JOHN J. GRIER CO.**, a corporation, Plaintiff-Appellee,

v.

**UNITED STATES** of America, Defendant-Appellant.

**No. 14341.**

United States Court of Appeals Seventh Circuit.

Feb. 17, 1964.

Louis F. Oberdorfer, Asst. Atty. Gen., Richard J. Heiman, Atty., Dept. of Justice, Washington, D. C., John Peter Lulinski, Asst. U. S. Atty., Chicago, Ill., Lee A. Jackson, Joseph Kovner, Attys., Dept. of Justice, Washington, D. C., Frank E. McDonald, U. S. Atty., for appellant.

Daniel D. Glasser, Chicago, Ill., for appellee.

Before HASTINGS, Chief Judge, and KNOCH and SWYGERT, Circuit Judges.

KNOCH, Circuit Judge.

The government has appealed from a judgment of the United States District Court in favor of the taxpayer, plaintiff-appellee, John J. Grier Co. (hereinafter

called "Grier"). The District Court held (in an opinion published at 216 F.Supp. 928) that the sale in 1959 by Grier of all the capital stock of its subsidiary Evergreen Supper Club, Inc. was the sale of a non-capital asset, resulting in an ordinary loss deduction. The government's view is that the loss resulted from the sale of a capital asset and as a capital loss is deductible only to the extent of Grier's capital gains.

The facts were all stipulated. Since 1907, Grier has been operating exclusively restaurants and other eating establishments, which until 1956 were all located in or adjacent to railroad stations. Beginning in 1953, Grier's revenue and profits declined steadily with the reduced volume of railroad activity. Numerous business opportunities all related to restaurants or the feeding industry, but not connected with railroad operations, were explored. Between 1955 and 1959 Grier investigated some 75 restaurants and eating houses available for sale in various areas. Grier bought about ten of these.

In February 1956, Grier began negotiations for purchase of the Evergreen Supper Club in Palatine, Illinois. These negotiations were substantially concluded with the purported owner, Paul A. Peterson, when, for the first time, Grier learned that the Club was owned by the Evergreen Supper Club, Inc., a corporation of which Mr. Peterson was the sole stockholder. The restaurant premises were leased to the corporation, and the lessor was likely to object to any assignment of the lease, dated September 15, 1952, which ran for 7½ years with an option to renew for 2½ years more at the same rental. The lease prohibited sublease, assignment or transfer of the leasehold interest by operation of law without the prior written consent of the lessor.

It is agreed that Grier could reasonably have believed that either a merger between Evergreen and Grier or liquidation of Evergreen and assignment of its leasehold interest to Grier might have required prior written consent of the lessor, which Grier had reason to believe might be obtained with difficulty, if at all. Mr. Peterson's attorney, Robert C. Keil, suggested the sale in the form of a sale of all the capital stock in order to avoid any difficulty about assignment of the lease.

Grier, in the interest of its own survival, negotiated to purchase the assets of a restaurant, and only after negotiations were nearly completed, found that to purchase those assets, it was necessary to take the stock of the paper corporation of which Mr. Peterson was the sole owner.

The government does not contest Grier's assertion that Grier and Mr. Peterson had agreed on a purchase price of $89,982.64 for the assets before he revealed the existence of the corporation, and that the price paid for the stock was identical.

Grier integrated the new restaurant with its own business, changing the name to "Grier Supper Club"; appointing its vice president, W. C. Darnell, Jr., to operate the club; paying directly all payroll, trade accounts, and miscellaneous expenses of the Club; including the Club employees in Grier's profit-sharing and hospitalization plans. Gross receipts were deposited regularly in the Club's separate accounts and Evergreen Corporation filed separate federal income tax returns, but at periodic intervals funds from those accounts were transferred to Grier's general account.

On its books of account, Grier carried the cost of its purchase of the stock as "investment, Grier's Supper Club." As the District Court noted, this fact does not conclusively characterize the stock for tax purposes as a capital asset. Smith & Welton v. United States, E.D.Va., 1958, 164 F.Supp. 605, 608.

In 1959, Grier sold the Evergreen stock to the lessor for $14,209.12, and in its 1959 federal income tax return, Grier claimed as an ordinary loss deduction the difference between what it paid for the stock and the proceeds of the sale, carrying back the loss to 1956. The

Commissioner of Internal Revenue determined that the loss arose from the sale of a capital asset, disallowed the carryback, and assessed a deficiency. Grier paid the assessment, made timely claim for refund and initiated its case in the District Court when refund was denied.

Corporate stock is not invariably classified as a capital asset. To ascertain whether stock is bought and kept not for investment purposes, but only as an incident to the conduct of the taxpayer's business, all the surrounding circumstances must be considered. The substance, as distinguished from the form, of the taxpayer's actions determines whether the sale of the stock results in ordinary gain or loss in this particular case. Gulftex Drug Co. (1957), 29 T.C. 118, 121, affd. 5 Cir., 1958, 261 F.2d 238; and Smith & Welton, Inc. v. United States, supra.

The Evergreen stock had value only to someone who wished to operate the Club. Grier bought the stock and retained it only to secure the assets as an incident to conduct of its restaurant business and not for investment. There was good reason to continue the corporation in form to safeguard the lease. The District Judge found no material variance in Grier's operation of the restaurant in its corporate form from the manner in which Grier would otherwise have operated it.

The government sees distinguishing factors in the cases on which the District Court and Grier rely. Kanawha Gas & Utilities Co. v. C. I. R., 5 Cir., 1954, 214 F.2d 685; Kimbell-Diamond Milling Co. v. Commissioner, 14 T.C. 74, affd. 5 Cir., 1951, 187 F.2d 718; Commissioner of Internal Revenue v. Ashland Oil & Refining Co., 6 Cir., 1938, 99 F.2d 588, cert. den. 306 U.S. 661, 59 S.Ct. 790, 83 L.Ed. 1057; Georgia Properties Co. v. Henslee, M.D., Tenn., 1955, 138 F.Supp. 587. In some of these cases, the corporations purchased were promptly liquidated and the assets distributed, but, as indicated, Grier had a good business reason unconnected with investment for allowing the corporate form to continue for the term of the lease.

Nor can we agree with the government that this case is basically distinguishable in principle from those cases involving purchase of stock to insure a source of supply for inventory or to post security for performance of a contract. Journal Co. v. United States, E.D., Wis., 1961, 195 F.Supp. 434; Electrical Fittings Corp. v. C. I. R., 33 T.C. 1026 (1960); Commissioner of Internal Revenue v. Bagley & Sewall Co., 2 Cir., 1955, 221 F.2d 944.

In the light of the specific circumstances of this particular case, the loss suffered by Grier in the sale of the stock was an ordinary and not a capital loss. The judgment of the District Court is affirmed.

Affirmed.