**SCHLUMBERGER TECHNOLOGY COR-PORATION, Plaintiff-Appellee-Cross Appellant,**

v.

**UNITED STATES of America, Defendant-Appellant-Cross Appellee.**

**No. 29400.**

United States Court of Appeals, Fifth Circuit.

June 11, 1971.

Rehearing Denied Sept. 15, 1971.

Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, Paul M. Ginsburg, Attys., Tax Div., U. S. Dept. of Justice, Washington, D. C., Ben A. Douglas, Atty., Tax Div., Dept. of Justice, Fort Worth, Tex., Anthony J. P. Farris, U. S. Atty., James R. Gough, Asst. U. S. Atty., Houston, Tex., Meyer Rothwacks, Thomas L. Stapleton, Gilbert E. Andrews, Janet R. Spragens, Attys., Dept. of Justice, Washington, D. C., George R. Pain, Asst. U. S. Atty., Houston, Tex., for the United States.

George H. Jewell, Jr., William C. Griffith, Houston, Tex., for taxpayer; Baker, Botts, Shepherd & Coates, Houston, Tex., of counsel.

Before WISDOM, THORNBERRY and DYER, Circuit Judges.

THORNBERRY, Circuit Judge:

The instant matter represents another skirmish in the constant taxpayer-Government struggle over the definition of the term "capital asset," a struggle generated by the advantages to taxpayers of capital gains and the corollary disadvantages of capital losses. The participants in the case at bar call upon us to determine whether taxpayer's loss on unrepaid short term advances, evidenced by promissory notes, to subsidiary corporations were, in light of Corn Products Company v. Commissioner of Internal Revenue, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955), deductible as a bad debt loss under Section 166(a) [1] of the Internal Revenue Code of 1954 or deductible only as a capital loss under Section 1232 (a) (1),[2] and whether taxpayer's loss realized upon the disposition of its stock in a subsidiary corporation is to be treated as an ordinary business expense or as a loss from the sale of a capital asset.

Taxpayer, Schlumberger Well Surveying Corporation (SWSC),[3] is involved in the business of measuring physical phenomena, principally in the earth but also in the atmosphere, primarily for aid in the discovery of oil, gas, and other minerals, but also for scientific, space exploration, and other purposes. At all times material to this case Electro-Mechanical Research, Incorporated (EMR), a wholly owned subsidiary of SWSC, was also engaged in the measurement business, using taxpayer's and its own expertise and research to develop telemetry devices and related measurement compo-

---

1. 26 U.S.C.A. § 166(a).

2. 26 U.S.C.A. § 1232(a) (1).

3. On April 1, 1966, SWSC was merged into Schlumberger Technology Corporation, which has brought this suit as statutory successor to SWSC.

nents for use by military and space agencies in above ground measurement problems. EMR was formed during World War II by SWSC personnel to use SWSC's induction logging principles and techniques in the development of a mine detector for use by the allied forces. Because SWSC was owned principally by French nationals, it was necessary for EMR, in order to obtain a United States security clearance, to be formed as a corporation separate from SWSC with voting control in United States citizens. After the War the EMR stock was transferred to the Schlumberger Foundation, a charitable organization owned by taxpayer's parent, Schlumberger, Limited. To qualify EMR for security clearance in connection with military and defense work, the EMR stock was transferred in 1957 to a voting trust with voting control in United States citizens. Subsequently, SWSC reacquired the stock.

Because of the very specialized nature of its operations and the high degree of reliability that must be built into the equipment to enable it to operate under the extreme conditions of temperature, humidity, transportation and rough handling to which it is subjected, taxpayer has found it necessary to design and manufacture its own equipment. For this reason SWSC maintains research and development facilities in Houston, Texas and Ridgefield, Connecticut. Research conducted at these facilities has produced equipment used in the well logging and telemetry business as well as measurement equipment susceptible of use in other fields.

During the 1950's data obtained from taxpayer's sensing and transmitting equipment was being analyzed by engineers at the well site. However, the tremendous increase in the amount of data

being obtained and the increasingly complex computations necessary to analyze it was making manual analysis less and less satisfactory. It soon became apparent to taxpayer that it must integrate computer analysis into its measurement system or lose its position in the measurement field. Consequently, taxpayer plunged into efforts to develop two types of logging devices embodying computer techniques: the dip meter log and the analog to digital computer. When the endeavors proved unproductive, taxpayer, convinced that SWSC's and EMR's scientific personnel lacked sufficient depth in computer technology to fulfill its needs, looked elsewhere for assistance. It found Computer Systems, Incorporated (CSI), a corporation primarily engaged in the development, manufacture, and sale of analog computers and in analog and digital computer research. Although CSI, which had just undergone bankruptcy organization, had not developed a commercially acceptable computer, it possessed highly experienced scientific and technical teams that were abreast or ahead of the field in computer technology. Taxpayer, believing that CSI was the answer to its need for computer expertise, subscribed in 1959 to 80% [4] of the common stock of that company for $1,521,000. Because CSI was involved in matters requiring a security clearance, taxpayer contributed the CSI stock to EMR, enabling voting control of CSI to reside in United States citizens through the voting trust. Immediately after it was acquired by SWSC, CSI required funds for operating expenses. To meet the need taxpayer in 1960 contributed $1,000,000 to EMR to permit it in turn to make a contribution in that amount to CSI's capital stock. In addition, taxpayer made a series of short term loans totalling $3,-200,000 to CSI.[5] To evidence the exist-

4. The balance of the stock was owned by key employees of CSI and an investment group.

5. The dates and amounts of the loans are as follows:

| | |
|---|---|
| July 15, 1960 | $500,000 |
| October 19, 1960 | 250,000 |
| November 21, 1960 | 400,000 |
| January 30, 1961 | 350,000 |
| March 23, 1961 | 750,000 |
| June 1, 1961 | 250,000 |
| July 3, 1961 | 50,000 |
| July 20, 1961 | 150,000 |
| September 1, 1961 | 200,000 |
| November 1, 1961 | 300,000 |

ence, the interest rate, and the due date of the loans, CSI gave simple notes to SWSC at the time or shortly after each loan was made. CSI defaulted on each note, although it did pay all interest through January of 1962.

For two reasons, CSI proved to be of marginal value to taxpayer: (1) CSI was unable to develop an acceptable analog computer, and (2) scientific developments subsequent to SWSC's acquisition of CSI indicated that the need for computer analysis in the measurement systems of SWSC and EMR could better be fulfilled by digital, as opposed to analog, computers. Consequently, in late 1961, taxpayer, believing it had obtained sufficient digital expertise for its purposes, decided to sell CSI. At that time CSI was insolvent, its stock was worthless, and its debt to SWSC was for all practical purposes worthless. In February 1962 taxpayer accepted one Robert Haskins' offer to acquire the CSI stock for $10 and to contribute $150,000 to CSI to keep it in operation for at least six months. As part of the arrangement taxpayer agreed to compromise the $3,-200,000 debt owed it by CSI for $150,000. On its 1962 federal income tax return taxpayer claimed the unrepaid balance on its advances to CSI [$3,200,000 less $150,000=$3,050,000] as a bad debt deduction under Section 166(a) of the Code. The Commissioner disallowed the deduction, treating the unrepaid balance as a capital loss under Section 1232(a)(1).

In March 1960 taxpayer acquired American Systems, Incorporated (ASI), a company organized by former Hughes Aircraft Company employees in 1959 for the purpose of designing, developing, manufacturing, and programming electronic systems, equipment and components for military use. In their previous positions with Hughes Aircraft, the men had met with considerable success in obtaining systems contracts. Taxpayer, believing the personnel in question could aid it in obtaining markets for the electronic business in which it and its subsidiaries engaged, desired to avail itself of the men's talents. However, the men refused to enter taxpayer's employ unless they were given stock options. To satisfy that criterion, taxpayer assisted the personnel in forming and organizing ASI, in which the research personnel were given stock options. Taxpayer then purchased for $1,505,000 cash 250,000 shares of Class A common stock of ASI and 15,000 shares of its preferred stock. Subsequently, taxpayer paid $1,253,750 for additional shares. To meet security clearance requirements taxpayer registered the ASI stock in the name of EMR.

Because of unexpected adverse business conditions and ASI's failure to obtain governmental systems contracts, ASI was on the verge of bankruptcy by February, 1962. It was indebted to SWSC in the net amount of $610,778, the result of a series of short-term loans in the amount of $750,000 made to it by taxpayer for operating expenses, reduced to the balance of $610,778 by mutual offsets for services rendered and property leased. ASI had given notes to SWSC to evidence the existence, the interest rate and the ninety-day maturity date of the loans. On March 2 SWSC sold its ASI stock to Teledyne, Incorporated for $500, sustaining a loss of $2,768,250. Shortly thereafter ASI offered to pay $300,000 to taxpayer if it in turn would cancel and write off the remaining debt of $310,778. SWSC accepted the offer. On its 1962 federal income tax return taxpayer claimed the unrepaid balance on its advances to ASI [$610,778 less 300,-000=$310,778] as a bad debt deduction under Section 166(a) of the Code, and it treated the $2,768,250 loss on the ASI stock as an ordinary loss. The Commissioner allowed $3,184 of the ASI debt as a bad debt but determined that the $307,594 balance was a loss realized in a transaction qualifying under Section 1232 of the Code and was, therefore, a capital loss. Furthermore, the Commissioner determined that the loss on the ASI stock was a loss from the sale of a capital asset and thus was a capital loss.

Taxpayer attacked the correctness of the Commissioner's rulings on the CSI and ASI matters in federal district court. Applying the capital assets test articulated in Booth Newspapers, Incorporated v. United States, 157 Ct.Cl. 886, 303 F.2d 916 (1962), the district court upheld taxpayer's position with respect to the CSI debt, holding it deductible as a bad debt under Section 166(a) rather than as a capital loss under Section 1232(a) (1). The trial court 305 F.Supp. 1020, upheld the Commissioner's position with respect to the losses on the ASI stock and debt, holding they were capital losses under the reasoning that the stock constituted a capital asset in the hands of taxpayer and that the compromise of the ASI debt was a retirement of an evidence of indebtedness within the meaning of Section 1232(a) (1).

The Government, appellant-cross appellee, appeals from the district court's disposition of the CSI debt. Taxpayer, appellee-cross appellant, appeals from the court's disposition of the ASI stock and debt. Initially we consider whether the trial court correctly identified the capital assets test articulated in *Booth Newspapers* as the proper standard to be applied in the instant matter. We then consider whether the test has been properly applied to the facts at hand.

Our inquiry begins with the Internal Revenue Code section that purports to define what is meant by a "capital asset." Section 1221 states that the term means " * * * property held by the taxpayer (whether or not connected with his trade or business), but does not include" (1) stock in trade or property of a kind includible in inventory; (2) property held primarily for sale to customers in the ordinary course of business; (3) real and depreciable personal property used in a trade or business; (4) copyrights, literary, musical or artistic composition, or similar property held by the

creator or any person whose basis is derived from the creator; (5) accounts and notes receivable acquired for services or stock in trade; and (6) certain government obligations. Since the debts and stock in question do not fall within the express exclusions of Section 1221, it would seem at first glance that they must be capital assets. It has been clear, however, since 1955 that we may not regard the literal language of Section 1221 as the alpha and omega of exclusions from the definition of a capital asset. In that year the Supreme Court, in Corn Products Refining Company v. Commissioner of Internal Revenue, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955), laid the cornerstone of a contracted definition of "capital asset." The taxpayer in that matter, a manufacturer of products made from grain corn, adopted a program of buying corn futures to avoid increases in raw material costs caused by droughts. As delivery approached, taxpayer sold its excess futures. Taxpayer maintained that the futures were capital assets and the gains and losses were thus capital. Rejecting the taxpayer's argument, the Supreme Court held that since the futures transactions were an integral part of taxpayer's business, the gains and losses on them were not capital but ordinary. The Supreme Court stated, "Admittedly, petitioner's corn futures do not come within the literal language of the exclusions set out in [Section 117(a) of the Internal Revenue Code of 1939]. * * * But the capital-asset provisions of § 117[6] must not be so broadly applied as to defeat rather than further the purpose of Congress. Burnet v. Harmel, 287 U.S. 103, 108, 53 S.Ct. 74, 76, 77 L.Ed. 199. Congress intended that the profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to

---

6. Section 117(a) (1) of the 1939 Code was substantially the same as the present section 1221 of the 1954 Code, except that it contained no exceptions to capital asset treatment in the cases of copyrights and similar property, notes and accounts receivable, and, before 1941, government obligations and real property used in the business.

transactions in property which are not the normal source of business income." 350 U.S. at 51–52, 76 S.Ct. at 24, 100 L.Ed. at 35.

The integrated business activities exception to the definition of capital assets has been applied and developed in a number of subsequent cases, including Booth Newspapers, Incorporated v. United States, *supra*. In that matter the Court of Claims, after reviewing the various cases that had applied the *Corn Products* doctrine, articulated the following test for determining whether a transaction falls within the *Corn Products* exception: " * * * if securities are purchased by a taxpayer as an integral and necessary act in the conduct of his business, and continue to be so held until the time of their sale, any loss incurred as a result thereof may be fully deducted from gross income as a business expense or ordinary loss. If, on the other hand, an investment purpose be found to have motivated the purchase or holding of the securities, any loss realized upon their ultimate disposition must be treated in accord with the capital asset provisions of the Code. * * * The fact that securities are 'property,' in the broad sense of that term, is not conclusive." 303 F. 2d at 921. In determining whether the transaction involved falls within the "ordinary" or "investment" categories, the Court must consider " * * * the circumstances of the transaction (its factual background, the necessities of the particular business involved at the par-

ticular time involved, and the intentions of the taxpayer, both at the time the securities were originally purchased and at the time they were disposed of) * * * " 303 F.2d at 921.

Analyzing the advances to CSI in light of this test [7] the district court determined that the transactions were integral and necessary acts in the conduct of taxpayer's business, were not motivated by an investment purpose, and, consequently, did not qualify for capital asset treatment. Appealing from this finding, the Government contends that the "investment motive" versus "business motive" analysis is an incorrect standard and that the district court erred in using it. The true test, asserts the Government, for determining whether transactions are accorded non-capital tax treatment, is not whether stock is acquired and debt incurred with a business rather than an investment motive but whether transactions are necessary as a "temporary business expedient," e. g., to acquire an inventory or protect a source of supply. In addition, as an alternative to its proffered "temporary business expedient" test, the Government suggests a "protection-expansion" test: An acquisition made to protect an existing business would qualify for ordinary loss treatment, while an acquisition made to expand the business would qualify for capital loss treatment.

■ In support of its first proffered test, the Government states, "Upon examination of the case law,[8] it will be ob-

---

7. Representative cases upholding the doctrine articulated in Booth Newspapers are Steadman v. Commissioner of Internal Revenue, 6th Cir. 1970, 424 F.2d 1, certiorari denied, 400 U.S. 869, 91 S.Ct. 103, 27 L.Ed.2d 109 (1970); Hollywood Baseball Association v. Commissioner of Internal Revenue, 9th Cir. 1970, 423 F. 2d 494; Waterman, Largen & Co. v. United States, 419 F.2d 845 (Ct.Cl. 1969), certiorari denied, 400 U.S. 869, 91 S.Ct. 103, 27 L.Ed.2d 109, (1970); John J. Grier Co. v. United States, 7th Cir. 1964, 328 F.2d 163; Pittsburgh Reflector Co., 27 TCM 377 (1968); Electrical Fittings Corp., 33 TCM 1026 (1960); Helen M. Livesley, 19 TCM 133 (1960).

8. The Government cites the following cases as illustrative of the temporary business expediency rationale: Western Wine & Liquor Co. v. Commissioner, 18 T.C. 1090 (1952); Clark v. Commissioner, 19 T.C. 48 (1952); Edwards v. Hogg, 5th Cir. 1954, 214 F.2d 640; Commissioner of Internal Revenue v. Bagley & Sewall Co., 2nd Cir. 1955, 221 F.2d 944; Booth Newspapers, Inc. v. United States, 157 Ct.Cl. 886, 303 F.2d 916 (1962); Chase Candy Co. v. United States, 130 Ct.Cl. 102, 126 F.Supp. 521 (1954); and Mid-State Products Co. v. Commissioner, 21 T.C. 696 (1954).

served that more often than not, when the sale of what ordinarily would be considered a capital asset has been treated as the sale of a non-capital asset, the application of the 'temporary business expedient' rule would not have required a different result." True though this may be, it does not follow that the condition of temporary business expediency is the sine qua non for application of the *Corn Products* doctrine. There are, as the Government admits, many cases that are inconsistent with the view that temporary business expediency is a dispositive test in *Corn Products* type cases,[9] including the recent decisions in Steadman v. Commissioner of Internal Revenue, 6th Cir. 1970, 424 F.2d 1, certiorari denied, 400 U.S. 869, 91 S.Ct. 103, 27 L.Ed.2d 109 (1970), and Waterman, Largen & Company v. United States, 419 F.2d 845 (Ct.Cl.1969), certiorari denied, 400 U.S. 869, 91 S.Ct. 103, 27 L.Ed.2d 109 (1970). Contrary to the Government's contention, we believe that temporary business expediency, properly viewed, is merely a factual element that, under appropriate circumstances, justifies a taxpayer's acquisition of what would otherwise be a capital asset, and, in turn, requires the acquiring taxpayer, if he desires to avoid capital asset treatment of the acquisition, to dispose of the asset once the temporary condition being remedied has terminated and the nature of the asset has changed from business purpose to investment purpose.[10] Finding no basis for elevating the condition of temporary business expediency from its present status to that of a controlling standard, we reject the Government's first contention.

In support of its alternative suggestion that we adopt an expansion-protection test in *Corn Products* type cases, the Government cites Smith & Welton v. United States, 164 F.Supp. 605, 609 (E. D.Va.1958), wherein it was stated, "The Court believes that a distinction has been drawn between cases in which securities are acquired for the purpose of obtaining an advantage which did not previously exist, as contrasted with situations in which securities are purchased for the purpose of protecting that which existed and is now threatened." This test may offer the advantages of simple formulation, but in both theory and practice the formula is dysfunctional because an expenditure made to advance a business into a new area may also be a means of protecting the business. *See e. g.,* John J. Grier Company v. United States, 7th Cir. 1964, 328 F.2d 163; Pittsburgh Reflector Company v. Commissioner, 27 TCM 377 (1968). For this reason the test has been criticized. *See* 3B Mertens, Law of Federal Income Taxation (Rev.). § 22.16; Troxall & Noall, Concept of Securities as Capital Assets, 19 Tax L.Rev. 185, 207–209 (1964). We decline to adopt it.

In sum, then, we believe the district court correctly determined that the test articulated in *Booth Newspapers, supra,* is the applicable legal standard for determining whether the transactions in question fall within the integrated business exception to the definition of a capital asset. The remaining question is whether the district court properly applied the test to the facts at hand.

*CSI Debt*

After a careful canvass of the record we are unable to declare that the district court erred in determining that SWSC's advances to CSI were integral and necessary acts in the conduct of SWSC's business and were not motivated by an investment purpose. It follows that the CSI debt was not a capital asset in the hands of the SWSC and was not within the coverage of Section 1232.

*ASI Stock and Debt*

The district court found that "[t]he business of ASI was not directly

---

9. See cases cited in Note 7, *supra.*

10. *See, e. g.,* Gulftex Drug Co. v. Commissioner of Internal Revenue, 5th Cir. 1958, 261 F.2d 238; Commissioner of Internal Revenue v. Bagley & Sewall Co., 2d Cir. 1955, 221 F.2d 944.

related to the business of SWSC, and the advance by SWSC into ASI's business was not designed to protect and improve the original and primary business of SWSC and did not aid SWSC in its primary business of providing a service and system of detection, measurement, transmission, and analysis of formations and chemistry in the depths of the earth, nor did it aid SWSC to maintain and improve the quality of this business." Consequently, the district court concluded that SWSC acquired ASI stock and advanced sums to ASI not as integral and necessary acts in the conduct of SWSC's business but as an investment. From that determination it followed that the ASI stock and notes were capital assets and that SWSC's losses on them were thus capital.

Undergirding the trial court's determination was its assumption that only one aspect of taxpayer's business—that of providing a service and system of detecting, measuring, transmitting, and analyzing physical phenomena in the earth for aid in the detection of oil, gas, and other minerals—was relevant to the question whether ASI's business was directly related to the business of taxpayer. This assumption is invalid. Although taxpayer's primary business was measuring physical phenomena in the earth for aid in detecting minerals, it was also engaged in developing telemetry devices and related measurement components for use by military and space agencies. While, as the district court found, the business of ASI—designing, developing,

manufacturing, and programming electronic systems, equipment, and components for military use—was not directly related to SWSC's primary business, we believe the conclusion is inescapable that ASI's business was directly related to SWSC's secondary business. At the time of the transactions taxpayer expected ASI's personnel to provide the company with marketing technique and know-how in the manner of obtaining large systems contracts, primarily with the Government, the performance of which would have enabled taxpayer to sell its equipment as part of the system. In addition, the acquisition of ASI provided SWSC with a valuable scientific research team that could not be obtained in any other way. When it became clear that the personnel were not providing the research and knowledge needed by taxpayer, taxpayer sold ASI. In these circumstances, it is evident that the ASI transactions were integral and necessary acts in the conduct of SWSC's business and were made with a business, not an investment, motive. It follows that the ASI stock and debts were not capital assets and that taxpayer's losses on them were not covered by Section 1232.

For the reasons stated above, the judgment of the district court is affirmed as to that portion of the judgment dealing with taxpayer's loss on the CSI notes, and reversed as to that portion dealing with taxpayer's loss on the ASI stock and notes.[11]

Affirmed in part; reversed in part.

---

11. In its reply brief the Government states, " * * * even if the Court were to hold that the ASI and CSI notes were not capital assets in taxpayer's hands, two additional and separate grounds would preclude applicability of Section 166(a)": (1) The loans made to CSI and ASI did not give rise to debts but were capital contributions; (2) the subject transactions indicated a sale of the notes to third parties as opposed to a cancellation of the debts between a creditor and debtor. These issues are not properly before this Court since both the Government and the taxpayer stipulated in the district court that the unrepaid advances to CSI and ASI were deductible either as bad debts under Section 166 or as capital losses under Section 1232. Accordingly, we do not reach the merits of these issues.