**BECKER WARBURG PARIBAS GROUP INCORPORATED, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 78 C 2065.

United States District Court, N. D. Illinois, E. D.

May 26, 1981.

**1274**

Howard G. Krane, Melvin S. Adess, James C. Munson and Raymond P. Wexler of Kirkland & Ellis, Chicago, Ill., for plaintiff.

Michael J. Weitzner, Tax Div., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

GRADY, District Judge.

This cause comes before the court on cross motions for summary judgment on Count II of the three-count complaint. Fed.R.Civ.P. 56. Counts I and III have been dismissed pursuant to settlement by the parties. All the facts relevant to Count II have been stipulated to and there is no dispute of fact which would preclude our granting summary judgment. For reasons discussed below, we grant plaintiff's motion for summary judgment. Defendant's motion for summary judgment is therefore denied.

*FACTS*

This is an action for a refund of taxes for the year 1971. The basis of Count II is a loss sustained by the plaintiff on the sale of a seat on the New York Stock Exchange. Plaintiff claimed this as a capital loss but now seeks to amend its return to claim an ordinary business loss. The stipulation of facts reads as follows:

1. Becker is a Delaware corporation engaged principally in the investment banking and securities business.

2. Becker's principal place of business is located at Two First National Plaza, Chicago, Illinois 60603.

3. Becker reports its taxable income on an accrual basis for the 52–53 week fiscal year ending on the last Friday of October.

4. Becker timely filed Federal income tax returns for its taxable years ended October, 1968, 1969, 1970, 1971 and 1972 with the District Director of Internal Revenue, Chicago, Illinois.

5. Becker's business includes, (sic) *inter alia*, retail and institutional sales activities, floor brokerage and specialist activities on various exchanges, arbitrage activities, correspondent service for other broker-dealers, corporate finance and underwriting, research in securities and pension fund performance evaluation.

6. All of Becker's activities, set forth in paragraph 5, generate income to Becker either in the form of fees, commissions or trading profits.

7. In order to conduct a number of Becker's business activities Becker owns memberships or seats on many securities exchanges throughout the country. As of the date of filing this action Becker owned seats on the following exchanges: American Stock Exchange—14, Chicago Board of Options Exchange—13, Midwest Stock Exchange—10, New York Stock Exchange—7, Boston Stock Exchange—1, Chicago Mercantile Exchange—1 and Pacific Stock Exchange—1.

8. As of June 1968, Becker owned seats on the following exchanges: American Stock Exchange—2, Midwest Stock Exchange—9, New York Stock Exchange—2, Pacific Stock Exchange—3, Boston Stock Exchange—1 and Detroit Stock Exchange —1.

9. As of June 1968, Becker had two memberships on the New York Stock Exchange ("NYSE"), having purchased one seat in July 1947 and a second seat in January 1968, both purchases being from parties unrelated to Becker.

10. Becker's sole purpose in purchasing these seats was to enable it to conduct certain aspects of Becker's business on the floor of the NYSE.

11. The purchase or ownership of a NYSE seat confers on the holder of the seat certain rights and privileges as enumerated in the Constitution and rules of the NYSE applicable at the time of purchase and ownership.

12. The rules of the NYSE prohibit anyone who is not a member from executing orders to purchase or sell stocks listed on the NYSE.

13. Without a membership on the NYSE, Becker would have had to pay commissions to members in order to have its stock purchases and sales on the NYSE executed.

14. A floor broker is a person who executes orders to purchase or sell stocks listed on the exchange at a designated post on the exchange. The execution of these orders, which may be from his own firm or from others, generates commissions to the firm.

15. In order to act as a floor broker on the NYSE, a person must have a membership in the NYSE. In order for a firm to have more than one broker operating on the floor of the NYSE, it must own a seat for each such broker.

16. A specialist is a person responsible for making the market with respect to a designated group of stocks. A specialist for designated stocks executes orders to purchase and sell those stocks from all members of the securities industry. The execution of these orders generates income for the firm which employs the specialist.

17. Each specialist is also required to be a member of the exchange on which he operates.

18. A member of an exchange must have a seat listed in his name even though the firm by whom he is employed may own the beneficial interest in that seat.

19. As of June 1968, all seats owned by Becker on the NYSE were registered in the names of the persons employed by Becker as floor brokers.

20. After the purchase of an initial membership on the NYSE by a firm, the purchase of an additional seat or seats relates solely to the ability of the firm to have additional floor brokers or specialists on the floor of the exchange in order to conduct, in a more efficient, profitable or economical manner, the activities in which the initial membership allows a firm to engage.

21. Becker's decisions to purchase additional seats on the NYSE have always been based on an economic determination that additional operating income would be generated over and above the expenses of having another broker on the floor.

22. Income generated to Becker by an additional floor broker includes: a) increased commissions resulting from Becker's ability to execute a larger volume of its own orders; b) reduced expenses resulting from a reduction in the amount of commissions Becker has to pay other floor brokers to execute orders; and c) increased commissions resulting from Becker's ability to execute a larger volume of orders for other firms.

23. The NYSE seats owned by Becker have always been used by floor brokers to generate income for Becker, either from floor brokerage or specialist activities. Becker never owned NYSE seats that were not in use for these purposes.

24. Whenever possible, Becker preferred to employ floor brokers and specialists who already owned their own seats, thereby avoiding the expense of purchasing an additional seat.

25. On July 3, 1968, Becker purchased a third NYSE seat from a party unrelated to Becker (hereinafter referred to as the "Webster Seat") for a total purchase price of $440,000.

26. Becker's decision to purchase the Webster Seat was based solely on its determination that the volume and nature of its business on the floor of the NYSE at that time economically justified the addition of another floor broker.

27. At the time of its purchase by Becker, the Webster Seat was listed in the name of J. Webster, who was employed by Becker as a floor broker on the NYSE and who did not own a NYSE seat.

28. During the entire time that J. Webster was listed as owner of the Webster Seat he was engaged in floor brokerage activities on behalf of Becker.

29. In August 1970 the Webster Seat was transferred by Becker from J. Webster to P. Orloff.

30. In connection with this transfer, Becker paid a fee of $7,500 to the NYSE.

31. P. Orloff was also employed by Becker as a floor broker and did not own a NYSE seat.

32. During the entire time he was listed as owner of the Webster Seat P. Orloff was engaged in floor brokerage activities on behalf of Becker.

33. The Webster Seat was offered for sale by Becker on April 30, 1971. A bid for the seat from a party unrelated to Becker for $230,000 was accepted by Becker on May 12, 1971 and the actual transfer took place on June 3, 1971.

34. The sole reason for Becker's decision to sell the Webster Seat was the fact that P. Orloff was leaving the NYSE to become a floor broker for Becker on the American Stock Exchange. Becker had no other broker to replace Orloff on the floor of the NYSE and, therefore, decided to sell his seat.

35. Becker's acquisition, ownership and sale of the Webster Seat was not motivated in whole or in any part by the expectation of generating gains or losses on the appreciation or depreciation in the value of said seat.

36. Becker realized a loss of $217,500 on the sale of the Webster Seat and claimed a capital loss of $217,500 in its Federal income tax return filed for its taxable year ended October 31, 1971. Pursuant to Sections 1212(a) and 6411 of the Internal Revenue Code of 1954 (26 U.S.C. §§ 1212(a) and 6411) Becker filed an application for tentative carryback adjustment of its Federal income taxes for its taxable year ended October 31, 1968 on account of the capital loss of $217,500 and with respect to which on or about June 6, 1973, plaintiff received a refund in the amount of $57,033.

37. On or about April 5, 1977, Becker timely filed a claim for refund of $104,401 for its taxable year ended October 31, 1971, with the District Director of Internal Revenue, Chicago, Illinois, claiming an ordinary loss deduction of $217,500 on the sale of the Webster Seat.

38. The Commissioner of Internal Revenue has taken no action regarding said claim for refund for Becker's taxable year ended October 31, 1971.

39. This suit is timely brought in that more than six months have elapsed since Becker filed the claim for refund described in paragraph 25 above.

40. Becker is the sole and absolute owner of this claim and has made no transfer or assignment of this claim or any part thereof. No action on the claim set forth in Count II of the Amended Complaint has been taken by the Congress of the United States or by any department of government except as set forth herein.

In addition to the stipulated facts, defendant also alleges that the transfer fee of $7,500.00 paid to the exchange in 1970 (see Stip. ¶ 30 *supra*) was capitalized by the plaintiff and added to the basis of the asset. Since plaintiff does not dispute this contention, we assume it is true for purposes of this motion. In addition, it should be explained that plaintiff reports its taxable income on an accrual basis for the 52–53 week fiscal year ending on the last Friday of October of each year. Any references to a "taxable year 197–" in this opinion refer to the plaintiff's taxable year ending in October.

*DISCUSSION*

The issue in this case is whether a stock exchange seat which was bought and utilized by an investment brokerage firm for the sole purpose of generating income in the ordinary course of the firm's everyday business is a capital asset or an ordinary ("non-capital") asset. Defendant presents two interrelated arguments against our finding the stock exchange seat to have been an ordinary asset in the circumstances of this case. First, defendant argues that a

stock exchange seat is and always has been defined as a capital asset under Section 1221 of the Internal Revenue Code. 26 U.S.C. § 1221. Second, defendant argues that the doctrine of *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955) does not require a different result as to this particular stock exchange seat because the plaintiff's motive was not "business" but "investment." For reasons discussed below, we reject defendant's interpretation of the applicable tax law.

*1. Section 1221 and the Corn Products Doctrine.*

Section 1221 defines capital assets as all property held by a taxpayer, with certain, enumerated exceptions.[1] Although § 1221 begins with a broad definition of capital assets, the Supreme Court has repeatedly held that "the definition of a capital asset must be narrowly applied and the exclusions interpreted broadly ... This court has always construed narrowly the term 'capital assets.'" *See Hort v. Commissioner*, 313 U.S. 28, 31 [61 S.Ct. 757, 758, 85 L.Ed. 1168]; *Kieselbach v. Commissioner*, 317 U.S. 399, 403 [63 S.Ct. 303, 305, 87 L.Ed. 358]." *Corn Products*, 350 U.S. at 52, 76 S.Ct. at 24.

*Corn Products* is the leading case expanding the definition of an ordinary business asset beyond a literal reading of § 1221. The Supreme Court held that the purchase of corn futures by a corn milling company for the sole purpose of insuring a steady supply of corn for its ordinary business constituted the purchase of ordinary business assets, not capital assets. Although futures, like other stock, are generally investment or capital assets, these particular futures played an "integral part" in the taxpayer's everyday business and were not purchased or used for the purpose of realizing gains from appreciation in the market value of the futures themselves. Such gains may incidentally result from ownership of the futures, but they are nonetheless profits and losses arising from the "everyday operation of the business" and must be regarded as ordinary. Congress did not intend to award preferential treatment to transactions which are a "normal source of business income." 350 U.S. at 52, 76 S.Ct. at 24.

1. 26 U.S.C. § 1221 reads:

§ 1221. Capital asset defined

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

(3) a copyright, a literary musical, or artistic composition, a letter or memorandum, or similar property, held by—

(A) a taxpayer whose personal efforts created such property,

(B) in the case of a letter, memorandum, or similar property, a taxpayer for whom such property was prepared or produced, or

(C) a taxpayer in whose hands the basis of such property is determined, for purposes of determining gain from a sale or exchange, in whole or part by reference to the basis of such property in the hands of a taxpayer described in subparagraph (A) or (B);

(4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1);

(5) an obligation of the United States or any of its possessions, or of a State or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue; or

(6) a publication of the United States Government (including the Congressional Record) which is received from the United States Government or any agency thereof, other than by purchase at the price at which it is offered for sale to the public, and which is held by—

(A) a taxpayer who so received such publication, or

(B) a taxpayer in whose hands the basis of such publication is determined, for purposes of determining gain from a sale or exchange, in whole or in part by reference to the basis of such publication in the hands of a taxpayer described in subparagraph (A).

The *Corn Products* doctrine has been applied where the taxpayer acquires the stock of another company solely for the purpose of ensuring a steady supply of a raw product required in the taxpayer's primary business. *Booth Newspapers, Inc. v. United States*, 303 F.2d 916 (Ct.Cl.1962); *Waterman, Largen & Co. v. United States*, 419 F.2d 845 (Ct.Cl.1969). It has also been extended to cases in which the purchased asset is itself used as an integral part of the primary business. *See Union Pacific R. R. Co., Inc. v. United States*, 524 F.2d 1343, 1358–59 (Ct.Cl.1975) (reacquisition of railroad line which had been a subsidiary of taxpayer prior to reorganization of taxpayer is ordinary asset); *John J. Grier Co. v. United States*, 328 F.2d 163, 165 (7th Cir. 1964) (stock of restaurant purchased by taxpayer already in the business of operating restaurants, for the purpose of operating restaurant, is ordinary asset). *See also Chemplast, Inc. v. Commissioner*, 60 T.C. 623 (1973), *affirmed* 506 F.2d 1050 (3rd Cir. 1974) (ownership of stock in corporation formed by taxpayer solely to develop use for one of taxpayer's inventions is ordinary asset).

*Grier* is the leading case extending *Corn Products* beyond the "supply insurance" fact situation. The asset purchased by Grier—stock in the restaurant—was purchased solely to enhance the profitability of his existing business by using the asset to generate revenue in the same manner Grier used other assets in his everyday business. The Seventh Circuit held that the loss sustained on the ultimate sale of the stock was deductible as an ordinary business loss.

Corporate stock is not invariably classified as a capital asset. To ascertain whether stock is bought and kept not for investment purposes but only as an incident to the conduct of the taxpayer's business, all the surrounding circumstances must be considered. The substance, as distinguished from the form, of the taxpayer's actions determines whether the sale of the stock results in ordinary gain or loss in [each] particular case. . . . Grier bought the stock and retained it only to secure the assets as an incident to conduct of its restaurant business and not for investment. . . . We [cannot] agree with the government that this case is basically distinguishable in principle from those cases involving purchase of stock to insure a source of supply for inventory or to post security for performance of a contract.

328 F.2d at 165. *Accord Union Pacific R.R. supra; Chemplast, Inc., supra; Pittsburgh Reflector Co.*, T.C. Memo 1968–75. We think the instant case, like *Grier*, is indistinguishable in principle from cases involving the purchase of stock to ensure a source of supply for the taxpayer's primary business. Nor is it distinguishable from *Grier* merely because Becker did not purchase stock but purchased the asset itself. In *Grier*, the stock was merely the indicia of ownership. The essential asset was the restaurant.

The cases cited by defendant for the proposition that a stock exchange seat is and always has been treated as a capital asset are factually distinguishable for a number of reasons. Most were decided prior to the *Corn Products* case, and many involved the purchase and sale of a stock exchange seat by an individual or business whose ownership of the single seat represented its only entry into—and exit from—the business of buying and selling securities. *See Samuel Cummins v. Commissioner*, 19 T.C. 246 (1952), *affirmed per curiam*, 217 F.2d 303 (2nd Cir. 1954); *Munson v. Commissioner*, 100 F.2d 363 (2nd Cir. 1938). The courts have clearly distinguished between the purchase of an asset to enhance an on-going business—as in the instant case—and the purchase of an asset which is a prerequisite to *entering* a business.[2] *See*

---

**2.** We are unable to find in the cases a satisfactory explanation for the tax law's distinction between assets purchased to enter into a business and assets purchased to enhance an ongoing business. Nonetheless, this distinction is time-worn and we see no need to disturb it within the framework of the facts of this case, particularly in light of the *Corn Products* decision after these cases. We express no opinion on the tax treatment that would be accorded a stock exchange seat purchased by a new in-

discussion in *Datamation, Inc. v. Commissioner*, T.C. Memo 1976–252, reported in 35 T.C.M. 1092, 1101 (1976). *Compare Caboara v. Commissioner*, T.C. Memo 1977–355, reported in 36 T.C.M. 1420 (1977) (license purchased as prerequisite to entering the business of operating a tavern is capital asset) *with John J. Grier Co.*, 328 F.2d at 165.

■ If the sole purpose of Becker in acquiring, using and selling the Webster Seat was to enhance its existing business by utilizing the seat in the everyday course of its ordinary business, the stock exchange seat should be treated as an ordinary business asset for tax purposes under the *Corn Products* rule. The question of fact to be resolved is whether the taxpayer's use of the asset was solely for "business" or "investment" purposes. This question can be answered by an analysis of the circumstances surrounding the use and transference of the asset in each case. We now address this question of fact.

## 2. "Business" v. "Investment" Use

■ The standard for deciding whether a taxpayer's use of an asset has a "business" purpose was articulated in *Booth Newspapers, Inc.*, 303 F.2d at 921.

... [I]f the [asset is] purchased by a taxpayer as an integral and necessary act in the conduct of his business, and continue[s] to be so held until the time of [its] sale, [then it is a non-capital asset].

This "integrated business activities" standard for application of the *Corn Products* doctrine has been frequently repeated and approved. *See e. g., Datamation Services*, 35 T.C.M. at 1101; *Schlumberger Technology Corp. v. United States*, 443 F.2d 1115, 1120–21 notes 7, 8 (5th Cir. 1971); *Dearborn Co. v. United States*, 444 F.2d 1145, 1166 (Ct.Cl.1971); *W. W. Windle Co. v. Commissioner of Internal Revenue*, 65 T.C. 694, at 708; *Chemplast, Inc.*, 60 T.C. at 630–32; *John J. Grier Co.*, 328 F.2d at 165. This business purpose must remain unchanged through the entire period of ownership and

sale by the taxpayer. *See W. W. Windle Co.*

■ The stipulated facts do not provide any basis for defendant's assertion that the plaintiff had any but a business purpose in the acquisition, use and sale of the Webster Seat, or that the Webster Seat was anything other than an integral and necessary asset in the operation of plaintiff's primary business. Defendant argues that plaintiff's capitalization of the $7,500.00 transfer fee is evidence of plaintiff's treatment of the Webster Seat as an asset purchased for "investment" purposes; a capital asset. We agree that capitalizing an expense incurred by reason of ownership of an asset may indicate that an asset was purchased as an investment. The Internal Revenue Service and the tax court have both held that transfer fees are generally capital expenses and represent part of the payment for a stock exchange seat. *Richard S. Harman*, 72 T.C. 362 (1972); *Charles J. Bradley*, 41 B.T.A. 153 (1940); Rev.Rul. 77–354, 1977–2 C.B. 50. These cases and the revenue ruling deal with payment of an *initial* membership fee by an individual who was both the beneficial and nominal owner of the seat and whose ownership represented his sole means of engaging in the business of buying and selling securities. *See* text accompanying n. 1 *supra*. However, the tax court in *Lehman v. Commissioner*, [P–H] ¶ 42,540 at 42–1386 (Tax Court Memorandum Decision, October 1, 1942) distinguished that situation from the proper tax treatment for transfer fees paid by a brokerage firm for the transfer of nominal ownership of a seat. It held that brokerage firms are to deduct these fees as ordinary, noncapital expenses in the year in which they are incurred.

The expenditure in question was not made in the acquisition of a capital asset, nor ... to acquire the use of an asset owned by another. The partnership was at all times the actual owner of the seats and the transfer fees were necessitated

vestment brokerage firm for the purpose of initially entering into the business of buying

and selling securities on the exchange. *See also* p. 1279 *infra*.

only by the requirement of the exchanges that title be held by an individual. In our opinion, the payments were an ordinary and necessary expense of carrying on the firm's business.

■ We hold that Becker's capitalization of the transfer fee in 1970 is not determinative of the issue of whether plaintiff's use of this asset was for "investment" purposes. Moreover, capitalization of this expense was improper under *Lehman*. The transfer fee should have been deducted as an ordinary business expense for 1970 and not added to plaintiff's basis for the Webster Seat.[3] In computing any refund which may be due Becker as a result of this decision, the $7,500.00 transfer fee paid in 1970 should be excluded from the basis of the Webster Seat.

■ We find that Becker's acquisition, use and sale of the "Webster seat" was solely to enhance its primary business by using the seat to generate ordinary income in the everyday course of its business. *See* Stip. ¶¶ 10, 21, 22, 23, 26, 34, 35. There are no facts to support a contrary conclusion. The stock exchange seat was a non-capital asset and any losses—or gains—resulting from its sale are part of plaintiff's "normal source of business income" and should be treated as ordinary gains and losses for tax purposes. Plaintiff Becker is entitled to deduct the loss sustained on the sale of the Webster Seat as an ordinary, non-capital loss for the tax year 1971.[4]

Plaintiff's motion for summary judgment is granted; defendant's motion for summary judgment is denied.

---

**3.** We do not address the question of whether the *initial* fee paid to the exchange for membership upon purchase of the beneficial ownership of the Webster Seat should be treated as a capital or non-capital expense under Treas.Reg. § 1.263(a)–2(a).

**4.** In calculating the refund due plaintiff, the refund of $57,033.00 received in June 1973 must, of course, be properly factored in. Stip. ¶ 36.